843 A.2d 803

**John Albert MILLER, IV**

v.

**STATE of Maryland.**

**No. 90, Sept. Term, 2000.**

Court of Appeals of Maryland.

Feb. 19, 2004.

Reconsideration Denied April 2, 2004.

2

**4**

8

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender; Martha Weisheit and Margaret L. Lanier, Asst. Public Defenders, on brief), Baltimore, for Appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellee.

Argued Before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Appellant, John Albert Miller, IV, was charged in the Circuit Court for Baltimore County with the murder, attempted rape, first degree sexual offense, robbery, and false imprisonment of 17–year–old Shen Poehlman. After the State filed a notice of its intention to seek the death penalty, the case was removed to Allegany County for trial. A jury in that court convicted Miller of premeditated murder, first degree sexual offense, robbery, and false imprisonment. A judgment of acquittal was entered on the charge of attempted rape.

At a separate sentencing proceeding, the jury found, beyond a reasonable doubt, that Miller was a principal in the first degree in the murder and that the State had proven, as an aggravating circumstance, that the murder was committed in

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

the course of a first degree sexual offense. The jury found that a second alleged aggravating circumstance—that the murder was committed in the course of a robbery—was not proved. Five mitigating circumstances were found by one or more of the jurors. Two such circumstances, found unanimously, were that Miller had not previously been convicted of a crime of violence and that he had a poor family environment. At least one, but not all, jurors also found as mitigators that Miller had children, that he was remorseful, and that he would likely die in jail. The jury unanimously concluded, by a preponderance, that the aggravating factor outweighed the mitigators and thus sentenced Miller to death. In addition to the death sentence imposed for the murder, Miller was sentenced to 30 years in prison for the first degree sexual offense, five years consecutive for the robbery, and one year concurrent for false imprisonment.

Miller appealed, raising fifteen issues that were fully briefed by him and the State. Just prior to the date set for oral argument, however, Miller filed a motion for new trial, claiming, as newly discovered evidence (1) the decision of the United States Supreme Court in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which he urged rendered the statutory process for weighing mitigating factors against aggravating factors unconstitutional, and (2) that Clarence Bobbitt, a State's witness against him, had received an inducement for his testimony. We postponed argument on the appeal to give the Circuit Court an opportunity to resolve the motion. In August, 2002, the court denied the motion, finding that (1) assuming the evidence relied upon by Miller with respect to Bobbitt constituted newly discovered evidence, he had not met his burden of demonstrating a substantial or significant possibility that the verdict of the jury in either the guilt/innocence or sentencing phases of the trial would have been affected, and (2) the decision in *Ring v. Arizona* did not constitute newly discovered evidence and did not, in any event, render the Maryland statute unconstitutional. Miller appealed from the denial of his motion, and we consolidated the two appeals and held oral argument on both. By the choice of

counsel, the oral argument focused on the issues raised in the motion for new trial.

Because of an unusual divergence of views among the members of the Court, there is in this case no majority opinion on all of the issues. Judge Raker would affirm the verdicts and the prison sentences but vacate the death sentence based on her view that the preponderance standard, required by statute and Rule of this Court to be used in determining whether the aggravating factor found by the jury outweighed any mitigating factors found by one or more of the jurors, is unconstitutional under principles enunciated in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona, supra.* In declaring that the death sentence should be vacated on that ground, she is joined by Chief Judge Bell and Judge Eldridge. Judge Battaglia, joined by Chief Judge Bell and Judge Eldridge, believes that the entire judgment should be reversed and that Miller should be awarded a new trial because of newly discovered evidence that the witness, Bobbitt, may have been promised leniency by the State in return for his testimony. They believe that, had that new evidence been presented to the jury, there is a reasonable possibility that the jury would have acquitted Miller of the first degree sexual offense charge, which would have made him ineligible for the death penalty, or, at the sentencing proceeding, would have failed to find the necessary aggravating factor, that he committed the murder while committing or attempting to commit the first degree sexual offense.

Along with Judges Cathell and Harrell, I believe that Miller has presented no basis for disturbing either the verdicts or the sentences. Judge Raker joins us in holding that the verdicts and prison sentences should be affirmed. The Court is thus in the very peculiar position of having three votes to reverse the death sentence under *Apprendi/Ring,* three votes to reverse the convictions and all sentences on the ground addressed by Judge Battaglia, four votes to affirm the verdicts and prison sentences, but four votes to reverse the death sentence. The judgment of the Court will therefore be to affirm the verdicts

and prison sentences, reverse the death sentence, and remand for a new sentencing proceeding on the murder conviction, with no majority of the Court as to why. The opinions authored by Judges Raker and Battaglia address only the one issue upon which they would reverse. Because Judge Cathell, Judge Harrell, and I would affirm the judgment in its entirety, it falls to us to address all of the issues raised by Miller.

## I.  BACKGROUND

### A.  Introduction

Miller does not contest that he lured Shen Poehlman to his apartment at the Bentley Park Apartments, in the Reisterstown area of Baltimore County, on July 28, 1998, with an offer of a baby-sitting job, and he no longer contests that, while she was in his apartment, he strangled her to death, using a belt. He also does not contest that he engaged in sexual activity with Ms. Poehlman. The substantive issues relevant to this appeal are (1) whether the sexual activity was consensual on Ms. Poehlman's part, as Miller maintained, or was violent and non-consensual and was of a nature to constitute a first degree sexual offense, and (2) whether the murder was committed in the course of a first degree sexual offense.

### B.  Ms. Poehlman's Disappearance and Events Leading to Miller's Arrest

In July, 1998, Shen Poehlman was a 17–year–old young woman who had just graduated high school with honors. She had a boyfriend, was working part-time during the summer, and was about to go off to college in Florida. She spent the afternoon of July 27 with her best friends, Lauren and Jessica, at the Bentley Park Apartments pool, where Jessica worked as a lifeguard. Shen and Lauren were employed as part-time telemarketers and were due to work from 5:30 to 9:30 that evening. Lauren left the pool around 3:30 or 4:00, but Shen remained for a while with Jessica. The girls agreed to meet at Lauren's home after work and spend the night there. Shen left the pool at about 4:30. She later told Lauren that, as she

was leaving, a man had asked her to babysit for him the next day and that she had agreed.

After Shen left, Miller, a resident of the apartment development who had been to the pool on earlier occasions, sometimes with a woman, approached Jessica and asked whether she and Shen had boyfriends. During a conversation that lasted about 45 minutes, he told Jessica that the woman he sometimes brought to the pool was an ex-girlfriend, that he had an ex-wife and children who lived in Rochester, New York, and that he had a five-year-old nephew who was coming to stay with him. Jessica observed a distinctive tattoo on Miller's arm and said that she had previously seen him driving a Geo Tracker. She recalled that he used the name "John."

When Shen and Lauren finished work, they went to Lauren's home. Lauren left to pick up Jessica, but Shen remained because she was waiting for a call about the babysitting job. Upon their return, Shen said that she had received the call. Lauren and Jessica were concerned, and Lauren advised Shen not to take the job with someone she did not know, but Shen persisted, although she agreed to page them when she arrived at Miller's apartment, at about 10:00 a.m.[1] When no message had been received from Shen the next day, Lauren and Jessica became worried and began looking for her car or the Geo Tracker. Unable to locate either, they contacted Shen's mother. When Shen failed to report for work at 5:30, the Baltimore County police were called.

Officer Ransom met with Jessica, Lauren, and Shen's mother at the apartment pool around 6:00. Lauren and Jessica related to him the events of the previous day, and Ransom radioed a description of both Shen and Miller. Based on what he had learned, Officer Ransom did not regard the matter as a routine "missing juvenile," and he called his supervisor, who dispatched additional officers to assist in locating Shen. By 7:00, they learned that a John Miller lived in Apartment 3B at

---

1. It appears that Shen was to meet Miller at the pool, rather than at his apartment, which heightened Lauren's concern.

the Bentley Park Apartments, and they went to that address. They also had obtained a New York registration for the green Geo Tracker that Jessica had described.[2] When there was no response at the apartment, they had a maintenance man let them in to see if Shen was there. In accordance with explicit instructions they had received from their sergeant, they looked only in places that would hide a person and did not open any drawers. Using flashlights, they slowly looked in the rooms, hallways, and closets, and finding no one, they left without disturbing anything. One of the officers observed a set of golf clubs in a closet.

The police continued to search the general area, leaving Officer Arrington in the parking lot in front of Miller's apartment. At about 9:10 p.m., a Geo Tracker fitting the description of the car they were looking for appeared without lights, approached the police car where Arrington was sitting, but then backed away and drove off. Arrington reported what he had seen and attempted to find the car but was unable to do so. When he returned to the parking lot, he saw the Geo parked in front of the apartment. Sergeant Price, in charge of the investigation, approached the apartment and knocked on the door. Ms. Sherman answered and, when asked if anyone else was there, she responded that John was in the bathroom and invited the officers inside. Upon Miller's exiting the bathroom, Sergeant Price informed him that he was bringing two girls to see if he was the person who was talking with Shen the previous day. Officer Ransom brought Jessica and Lauren to the apartment parking lot. When Miller, in the company of several officers, exited the apartment, the girls immediately began to cry and said "that's him, that's him." At that point, which Sergeant Price said was about 9:30 p.m.,

---

**2.** The car was actually owned by Miller's girlfriend, Isabella Sherman, who was also the lessee of the apartment. Miller and Sherman met and began a relationship in Rochester, New York. When she moved to Maryland to take a new job, Miller moved with her. Miller worked at a convenience store in Maryland for about a month but had been fired and was unemployed at the time relevant here. Ms. Sherman testified, and Miller admitted, that she allowed Miller to use her car while she was at work.

Miller was arrested, handcuffed, patted down for weapons, and taken to the police station for further investigation. The apartment was secured pending issuance of a search warrant.

### C.  Miller's Statements and Subsequent Events

As the search continued for Shen, Sergeant Price notified the homicide unit, and Detective Hill, a homicide detective, met with Miller at the police station. Miller was given his *Miranda* warnings at about 11:30 p.m. and questioned about his knowledge of Shen's disappearance and whereabouts. Miller said that, in May, he had come to Baltimore from Rochester with Ms. Sherman, that she had obtained a job in Baltimore and that he had hoped to get a job with the *Orioles*. In an oral statement later reduced to writing, he said that, after learning Shen's name from the lifeguard, he asked if she could babysit for him in about two weeks, as his children were coming from New York, that Shen asked him to call her that evening around 10:00, that he did so but she said that she was going away for a week, and he said that he would call her when she returned. He claimed that he had no further contact with Shen. The next day, he said, he took Ms. Sherman to work, then returned to his apartment, got his golf clubs, and played golf with three other men from about 9:00 a.m. to 2:30 p.m. He then went shopping for an engagement ring for Ms. Sherman and did a few other errands. When he returned to his apartment, he was arrested.

At about 3:00 a.m., while Miller was still being questioned, Detective Walsh located Shen's car in a dead-end court of an apartment complex not too far from the Bentley Park apartments. The windows were up and the car was locked. In the back seat was Shen's body, lying face down, partially covered with a blanket. Her head and shoulder were visible. Because it was obvious to Detective Walsh (and, upon his arrival, Detective Bollinger) from signs of lividity that Shen was dead and had been dead for some time, he did not disturb the scene.

Detective Hill was informed of the discovery at about 3:15 a.m. He told Miller that Shen's body had been found and stated that he did not believe Miller's story. Miller put his

hands over his face, began shaking, and admitted that he had killed Shen. He then gave a long oral statement followed by a written one. In those statements, he admitted that he met Shen at the pool around 9:30 on the morning of the 28th and took her to his apartment. He said that he gave her some chastity belts, which she put on, that she laid down on her stomach, and that he then performed oral sex on her, masturbated, and ejaculated on her back. When she promised not to tell anyone, he panicked, believing that she would, so he put a plastic clothing bag over her head, telling her that he merely wanted her to pass out. When she pretended to pass out but had bitten a hole in the plastic, he panicked again and put a pillow over the bag and a belt around her neck. When she asked him to stop, he did. He said that, at or about this point, he called and spoke with Ms. Sherman. After finishing the call, he put Shen in her car, took her to another apartment complex, covered her with a blanket from her trunk, and left her. He said that she was still breathing, that he should have called for help, but that he left her in the locked car, with the windows up, in the 90–degree heat. He took her key, shirt, and purse, threw the key near a tree and the purse and shirt in different dumpsters.

Following the statement, Miller took the detectives to the dumpsters, where they recovered Shen's shirt and purse, and to the tree, where they found the car key. Upon his return to the police station, Miller was left under guard in an interview room, from which he made a number of telephone calls. His part of the conversations was overheard by the attending officers, who later testified about them. In some of those calls, he admitted masturbating but denied "having sex." In a call to his father, he admitted having oral sex with Shen as well as masturbating on her. In some calls, he said that he had killed Shen; in others, he said that she was, or may have been, alive when he left her but that, by leaving her locked up in the car in ninety degree heat, it did not matter. In most, he admitted strangling her and admitted as well that he could have saved her and knew he could have saved her, but chose not to do so. He told his mother that "one thing led to

another, and he was afraid she was going to tell, and he choked her." He added that "she was alive when he left her, but the car was closed up, and it was ninety degrees out." In a call to someone named Kim, who, as it turned out, was a former girlfriend in Rochester, he said that "the girl was almost dead or dead when I left her," adding that "it probably wouldn't have mattered" as "it was so hot in the car all closed up." He said to someone named Chris that a girl from the pool came over, that "we started messing around," but he got scared when he realized she was under age, that he put a bag over her head and tried to knock her out, and that he then "put my belt around her and choked her and put her in her car." He added that "I think I could have saved her, but I was afraid." He told Vito Calzone that "[a]fter I hurt her, I couldn't let her go. I strangled her a little bit. I left her in the car, and she ended up dying." [3]

### D. Additional Trial Evidence

Miller did not testify at his trial. Much of the evidence, already described, came from the various police officers, from Jessica and Lauren, and from photographs of Miller's apartment, of Shen's body as it was recovered, and from the scene where her car was located. It was stipulated that vaginal, rectal, and oral swabs taken from Shen's body were negative for the presence of semen, but that a semen stain on Shen's blouse came from Miller.

Ms. Sherman testified that Miller had taken her to work on the 28th and then used her car. She called at the apartment between 9:00 and 9:30 a.m., but got no answer. Miller called her at work between 11:30 and noon and sounded rushed,

---

**3.** As an interesting side note to Miller's credibility, or lack thereof, in contrast to his suggestions in the telephone calls that Shen may have been alive when he left her in the car, he tells us in his brief, as a judicial admission, that "[t]he disposal of her body necessarily occurred *hours after the killing,* because, as the Medical Examiner testified, lividity had become fixed in Shen's back at the time she was found lying face down. *It is obvious, therefore, that she was left lying on her back for hours after she died, before appellant moved her to her car and disposed of her property."* (Emphasis added).

which, to Ms. Sherman, was unusual. He came to pick Ms. Sherman up from work at about 8:30, which was an hour before she was due to leave. He was sweating profusely and had vomited, claiming that something he ate for lunch had made him sick. Nonetheless, they stopped at a Taco Bell on the way home to get some carry-out food to take home. When they approached the apartment, they noticed several police cars. Miller turned off the car lights and put the car in reverse, claiming that he was looking to find a parking space. When the police went around the block, Miller pulled in front of the apartment.

Ms. Sherman said that, upon entering the apartment, she turned on the lights, but that Miller followed her and turned off the lights. He then entered the bedroom, changed clothes, went to the balcony, and attempted to climb down from the second story apartment, saying that the police were after him. Upon questioning by Ms. Sherman, he said that he had met a girl at the pool, that she had come over to the apartment, and that "he thought that he had hurt her." As the police approached the apartment, he became frantic and added "I think I might have killed her." When the police knocked on the door, he ran into the bathroom and asked Ms. Sherman to tell the police, first, that he was not there and then that he had been playing golf all day. Ms. Sherman declined to do that. She opened the door and invited the police into her apartment.

The Medical Examiner opined that the cause of death was ligature strangulation and that the herringbone pattern that he observed on Shen's neck was consistent with having been caused by the belt that the police eventually found in Miller's apartment. The Medical Examiner also described a number of bruises and abrasions that he found on Shen's head, including the lip. He testified that the bruises were the result of blunt force injuries inflicted while Shen was still alive, with her having been struck on the head with a blunt object. He found similar bruises in the area of the right front breast and the left leg and a number of abrasions on the head and on other parts of Shen's body. The doctor attributed some of the

body bruises, but not those on the head, to a "terminal fall"—the last fall as Shen was dying.  In the autopsy report itself, the Medical Examiner concluded that "[t]he pattern of injuries of the head and chest are consistent with Ms. Poehlman having been struck once on the chest and a minimum of four times on the head with a blunt object."

The autopsy commenced at 11:40 a.m. on July 29.  The doctor said that, because the autopsy was performed so quickly after delivery of the body, the time of death could be fixed with greater certainty.  From the condition of the body, the medical examiner opined that Shen had been dead for "close to" 24 hours.  He also testified, based on the lividity in the victim, that she had laid on her back for eight to twelve hours before being moved.  That evidence, coupled with Miller's statements and Ms. Sherman's testimony regarding the telephone call, not only established that Shen was in Miller's apartment when she died but that she had been kept there for a considerable period of time before being placed in her car, a fact which, as noted above, Miller now concedes.  *See ante*, n. 3.

Finally, for our present purposes, the State produced Clarence Bobbitt, then an inmate at Roxbury Correctional Institute.  Bobbitt and Miller had been cellmates at the Baltimore County Detention Center while Miller was awaiting trial.  Bobbitt recounted a conversation he had with Miller about the crime, in which Miller confessed that the sexual activity was not consensual, as he had maintained.  Miller told Bobbitt that he had asked the girl to babysit and that she had agreed:

"She knocked on the door.  He opened it.  She asked him where the kids were.  He said they ain't here right now.  And then she came in.  And he tried to seduce her.  She said no.  Threw her on the bed.  He smacked her, ripped her top off, started sexually assaulting her. And then he strangled her with his hand.  And he put a bag over her face.  And then he put a chastity belt on her face ... I mean around her neck, and stepped on one-half and pulled on the other half of it.  And realized what he had done.  And then he went and took her down ... wrapped in a

blanket, took her downstairs, put her in the backseat of her car, drove like two blocks and parked the car, took the keys, and took the keys and her money out of her pocket ... I mean took the money out of her pocketbook and put it in her back pocket, put it in his pocket. Took everything else, chastity belt, her shirt cause he had got semen on it and threw all that in a trash can."

Miller's convictions rested essentially on this evidence. Additional facts will be recounted in connection with our discussion of the various issues raised in the appeals.

## II. DISCUSSION

As noted, Miller has raised fifteen issues in his direct appeal. In the appeal from the denial of his motion for new trial, he embellishes his argument that the weighing aspect of our death penalty statute is unconstitutional and adds the argument that newly discovered evidence shows the prospect that Bobbitt did receive leniency for his testimony, which entitles him to a new trial. We shall consider those issues first, because they are the ones that divide the Court.

### A. Apprendi and Ring

Maryland law provides three possible penalties for a person found guilty of first degree murder: death, imprisonment for life *without* the possibility of parole, or imprisonment for life *with* the possibility of parole. A person so convicted may be sentenced to death, however, only if (1) the State gives advance written notice of its intent to seek the death penalty and informs the defendant of each aggravating factor upon which it intends to rely; (2) with exceptions not relevant here, the jury [4] finds, beyond a reasonable doubt, that the defendant was a principal in the first degree in the murder; (3) the jury finds, beyond a reasonable doubt, the existence of at least one aggravating factor that is specified in the law and of which the

---

4. The defendant has the right to have his/her sentence determined by a jury or by a judge. Miller chose to have the jury determine the sentence, so we shall refer to the sentencing body as the jury.

State has given notice; and (4) the jury either finds no mitigating circumstances or finds, by a preponderance, that the aggravating factor(s) it has found to exist outweigh any mitigating circumstance(s) that one or more jurors have found, by a preponderance of evidence, to exist.

The jury in this case was instructed in conformance with that statutory construct. As noted, it found, beyond a reasonable doubt, that Miller was a principal in the first degree in Shen's murder and that the murder was committed in the course of a first degree sexual offense, which is one of the aggravating factors allowed by the statute. It also found, presumably by a preponderance, as instructed, that that aggravating factor outweighed any and all mitigating factors found by one or more of the jurors. Hence, the death sentence. In his direct appeal from the judgment and in his appeal from the denial of his motion for new trial, Miller claims that, under the pronouncements and holdings of the Supreme Court in *Apprendi v. New Jersey, supra,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona, supra,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the use of a preponderance standard to govern the weighing of aggravating and mitigating factors is unconstitutional.

That argument was made in *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002), which was decided after *Apprendi* but before *Ring* was announced, and was rejected. It was made again, after *Ring* was decided, in *Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003), and again rejected. Our decisions in *Borchardt* and *Oken* were four-to-three decisions. Judge Raker, joined by Chief Judge Bell and Judge Eldridge, urged in dissent that first *Apprendi* and then *Ring* did, indeed, require that a finding that aggravating factors outweigh mitigating factors be beyond a reasonable doubt and that any lesser standard was unconstitutional. They continue in that belief, which accounts for their separate opinion in this case. As expressed only a few months ago in *Oken,* however, a majority of this Court holds to the belief that *Apprendi* and

*Ring* do not render the preponderance standard, applied only to the judgmental weighing process and not to any fact actually deducible from evidence, unconstitutional. Until the Supreme Court chooses to declare otherwise, that remains the judgment of this Court.

## B. *Clarence Bobbitt*

We have recounted Bobbitt's testimony. Though suspect in that it came from a "jailhouse snitch" with a significant criminal record, it did serve to corroborate other evidence indicating that the sexual activity that concededly occurred was not consensual, that it constituted a first degree sexual offense, and that Shen was strangled to death in the course of that offense. At trial, Miller objected to Bobbitt's being called as a witness, claiming that the State had promised him leniency in return for his testimony and had failed to disclose that fact. The motion was denied, and Miller did not complain about that ruling in his appeal from the judgment. In his motion for new trial, however, he claimed to have discovered new evidence of such leniency, evidence of which he could not have been aware at the time of trial. As noted, the court found that Miller had failed to show that there was any substantial or significant possibility that, had the new evidence been before the jury at trial or sentencing, the verdicts or the sentence would have been any different. That ruling is before us in Miller's appeal from the denial of his motion for new trial.

Judge Battaglia, joined by Chief Judge Bell and Judge Eldridge, find merit in Miller's appeal from the denial of his motion for new trial. As only three judges join that opinion, it does not represent the majority view of this Court. Regrettably, a rather detailed factual exposition is required to demonstrate why Miller's complaint has no merit.

Prior to Bobbitt's taking the stand, defense counsel, having reviewed his prison file, moved to preclude him from testifying on the ground that the State had made promises of leniency in return for his testimony and had failed to disclose that fact. The court held a hearing on that motion, at which the prosecu-

tors in the *Miller* case—Mr. Norman and Ms. Coffin—denied that any deals had been made for his testimony. Mr. Norman represented to the court that "[t]here is no leniency promise to this man in exchange for his testimony." Ms. Coffin added, "As an officer of the Court, no member of the State's Attorney's Office ever extended any offers to Bobbitt in exchange for his testimony in *State v. Miller*."

The State submitted an affidavit from the Assistant State's Attorney who prosecuted Bobbitt that an agreement had been made with Bobbitt, but that it did not involve his testifying in the *Miller* case. Rather, the affidavit was to the effect that the guidelines in Bobbitt's case for first degree burglary and unauthorized use warranted a sentence of from seven to ten years in prison and that the agreement, in return for a guilty plea, called for ten years, with all but five years suspended in favor of three years probation and a TAS[C] evaluation.[5] The prosecutor denied even knowing that Bobbitt was to be a witness in the *Miller* case until after the plea agreement had been made. On this evidence, the court denied the motion to exclude Bobbitt's testimony, finding that "there has been no showing that the State entered an agreement, deal, or understanding with this witness, whether formally or informally." The correctness of that ruling is not before us.

Bobbitt, 19 at the time, admitted at trial that he had previously been convicted of first degree burglary and possessing and selling handguns, that he had been using drugs since he was 14, that he had been carrying guns since he was 13, that he had been in jail since he was 17, that he was currently incarcerated for violating probation on the burglary and gun charges, that he had pled guilty to new charges of car theft and burglary, and that he was then awaiting sentence on those convictions. He repeatedly denied that any deal had been made for his testimony and said that he was not expect-

---

5. TASC is an acronym for Treatment Alternatives to Street Crime. It is a program offered in Baltimore County that includes drug and alcohol counseling.

ing any leniency because of his testimony. The relevant colloquy, on cross-examination, was:

"Q  ... You've already pled guilty to burglary again, is that correct?

A.  Yes

Q.  And unauthorized use?

A.  Yes.

Q.  And you're pending another since. When are you coming up for sentencing?

A.  Next month. No, it's this month, the 9th.

Q.  February 9th?

A.  Yes sir.

Q.  And aren't you expecting the Judge to go easier on you cause you're here testifying today?

A.  No. See I had pleaded guilty before I even found out.

Q.  Answer the question, sir.

A.  Oh, no.

Q.  No?

A.  No sir."

Bobbitt added that he had not even told his lawyer about the conversation with Miller when he discussed and entered the guilty plea.

The sentencing, scheduled for February 9, was postponed. Bobbitt was eventually sentenced by Judge Fader in April, 2001—more than a year after he testified in the *Miller* case. At the time, he was serving a four year sentence imposed by Judge Levitz in another case. Judge Fader suspended the entire ten year sentence and remanded Bobbitt to prison to complete the other sentence. It is not clear from the record before us whether, at that time, he had been accepted into the TASC program or what progress, if any, he had made with his drug problem.[6]

---

6.  Later proceedings against Bobbitt reveal that he had been accepted into the TASC program but had missed five meetings and, in October, 2001, had tested positive for cocaine.

Two years after his testimony in the *Miller* case, Bobbitt was called as a State's witness in the prosecution of his uncle, Richard Joswick, for murder. Although there was no connection between the *Miller* and *Joswick* cases, defense counsel in *Joswick* brought out the fact that Bobbitt had testified in *Miller*, suggested that he had been given leniency in return for his testimony in a murder case, and sought permission to explore whether his current testimony in *Joswick* was similarly motivated. Counsel cross-examined him on that, and Bobbitt again denied expecting or receiving any benefit for his testimony in *Miller*:

"Q   Mr. Bobbitt, you have testified before, haven't you?

A Yes.

Q   You testified in a murder case, did you not?

A Yes, sir.

Q   And when you testified in that case, the person that you testified against went to jail, didn't he?

A He got the death penalty.

Q   Now, you had a charge hanging over your head at that time, did you not?

A Yes, and I went to prison.

Q   You went to prison, but you didn't go to prison as long as you could have;  is that right?

A.   Yeah.

Q.   And you got a benefit?

A.   *Not for testifying I didn't.*

  *   *   *   *

Q.   But you expected a benefit from that, did you not?

A.   *No, I did not.*"

(Emphasis added).

On re-direct examination, the prosecutor elicited the testimony that Miller now complains of and that Judges Battaglia, Bell, and Eldridge find compelling:

"Q. Just so I'm clear, Mr. Bobbitt, you testified in a matter completely unrelated to this case against a John Miller, is that right?

A. Yes, sir.

Q. Did you have a plea agreement in that case?

A. Yeah.

Q. Where you entered into a negotiation with the State?

A. Like a plea with the State?

Q. Yes.

A. *Yeah, we pled for a sentence.*

Q. *Exactly.* And you had entered into a bargain; is that right?

A. Yes, sir.

Q. In exchange for that bargain, you gave certain testimony in that case; is that right?

A. *Yes, sir?*

Q. Did anything like that take place in this case?

A. No, sir."

(Emphasis added).

Regarding Bobbitt's ambiguous response to the penultimate question, recorded as a *question*, rather than as an *answer*, as newly discovered evidence that Bobbitt indeed, may have received a plea bargain calling for him to testify in Miller's case, Miller moved for a new trial. His argument was that Bobbitt had given false testimony regarding the bargain, that the State knew or should have known that his testimony was false, and that its failure to advise Miller of Bobbitt's false testimony constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the hearing on that motion, Mr. Norman, who had prosecuted Bobbitt, again testified that no promises had been made to Bobbitt in return for his testimony. With the concurrence of defense counsel, the State proffered that Ms. Coffin, who assisted in the prosecution of Miller, would give similar testimony—that she had not even met Bobbitt until the day he testified in

Miller's case and had made no promises or deals for his testimony. Neither side called Bobbitt to testify.

Stephen Bailey, who prosecuted Joswick, testified regarding the colloquy upon which Judge Battaglia relies (to the exclusion of all other evidence). Bailey explained that Joswick, Bobbitt's uncle, was accused of breaking into his girlfriend's house and strangling her and that the investigation revealed that Bobbitt, who had just been released from prison, had been with Joswick the day following the murder. Bailey said that he had no knowledge of Bobbitt's involvement in the *Miller* case and, initially, had no intention of calling Bobbitt to testify in *Joswick.* He described Bobbitt as a very reluctant and emotional witness—during cross-examination, counsel was "bringing out the full import of the fact that Bobbitt's testimony could possibly send his uncle to prison for the rest of his life" and that "there were tears running down his face, he had mucus running out of his nose, his shoulders were visibly heaving, that continued through the cross and redirect." Bailey added that, because of Bobbitt's agreement to testify, his own mother—Joswick's sister—would no longer speak to him.

Bailey said that he had talked with Bobbitt on two occasions prior to the *Joswick* trial and had made clear to him that there would be no deals for his testimony in that case, and that at no time during those conversations had Bobbitt ever indicated that he had made a deal in connection with his testimony in the *Miller* case. This became significant, because, prior to the *Joswick* trial, Bobbitt was arrested again and faced the prospect of having Judge Fader revoke the probation. In fact, that is what occurred: he received a three-year sentence for the new crime, and Judge Fader did, indeed, revoke the probation and direct execution of the entire ten-year sentence that had previously been suspended. Based on the cross-examination, however, Bailey suspected that defense counsel had some evidence indicating that a deal had been made with respect to the *Miller* case and decided to explore the matter on re-direct examination.

Having heard all this evidence, the trial judge found, as a fact, that, even if that one ambiguous response could be regarded as newly discovered evidence, "the Defendant has not met his burden to demonstrate that there is a substantial or significant possibility that the verdict of the jury in either the guilt/innocence or the sentencing phases of this case would have been affected." The court obviously did not believe that, had the jury heard that one response, in context and along with all of the other evidence bearing on the question, its verdicts and sentence would have been any different.

Miller, and Judges Battaglia, Bell, and Eldridge, view the one ambiguous response, recorded not as an *answer* but as a *question*, not only as clear proof that Bobbitt, indeed, may have received a benefit for his testimony but as so significant that, had the jury heard that inquisitive response, it likely would not have convicted Miller of the sexual offense or sentenced him to death.

Miller's argument, and our three colleagues' belief, that Miller is entitled, as a matter of law, to a new trial is wholly unwarranted; there is no reasonable basis whatever for such a conclusion. They ignore the unambiguous testimony of Bobbitt, in both the *Miller* case and the *Joswick* case, that no deal was made for his testimony in *Miller*, they ignore the unambiguous testimony of every prosecutor involved in the matter, and they give no credence whatever to the finding of the trial judge, who heard all of the evidence that the jury heard, that Miller had failed to persuade him that there is any substantial or significant possibility that the one ambiguous response would have produced any different result. There is no reasonable basis for a belief that, had the jury heard this one response from a highly emotional witness, it would have disregarded or found unpersuasive the clear and unambiguous testimony of every prosecutor involved and of Bobbitt himself that no deal had been made for his testimony.[7]

---

7. Judge Battaglia claims that her conclusion is not based on this one ambiguous response but rather on her determination that "Bobbitt responded affirmatively no less than five times to questions about a plea

█ Newly discovered evidence warrants a new trial only if it "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected" and that the only issue on appeal from a ruling denying such a motion is whether the trial court abused its discretion in concluding that that test had not been met. *Campbell v. State,* 373 Md. 637, 821 A.2d 1 (2003); *Baker v. State,* 367 Md. 648, 695–96, 790 A.2d 629, 657 (2002); *Jackson v. State,* 358 Md. 612, 626, 751 A.2d 473, 480 (2000). There is *nothing* in this record to justify upsetting the trial judge's conclusion that Miller had failed to establish that possibility.

### C. Reasonable Doubt Instruction at Sentencing

At the conclusion of the guilt/innocence stage of trial, the court instructed the jury that the State had the burden of proving guilt beyond a reasonable doubt. It told the jury that the State need not prove guilt beyond all possible doubt or to a mathematical certainty, but that proof beyond a reasonable doubt "requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief *without reservation* in an important matter in your own business or personal affairs." (Emphasis added). No exception was taken to that instruction, and no complaint is made about it here.

At the sentencing proceeding, the trial court correctly informed the jury that, in order to impose a sentence of death, it was required to find, beyond a reasonable doubt, that Miller was a principal in the first degree in the murder and that he committed the murder while attempting to commit a first

---

bargain related to the *Miller* case." It is true that Bobbitt responded on several occasions to questions about a plea bargain, but on each occasion he specifically denied that there was any leniency promised for his testimony. Both he and the prosecutors consistently described the plea bargain as one for sentence: a plea of guilty in return for a 10 year sentence with five years suspended. The *only* response that could conceivably indicate otherwise is the one followed by a question mark. Judge Battaglia fails to note any other evidence in this regard, and for good reason: there is none.

degree sexual offense. The court defined "reasonable doubt" as follows:

> "A reasonable doubt is defined in the law as such a doubt as would cause a reasonable person *to hesitate to act* in the grave or more important transactions of ones life. Proof beyond a reasonable doubt does not mean proof beyond any doubt or proof to a mathematical certainty, but it does require such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief in an important matter affecting your own business or personal affairs."

(Emphasis added).

No exception was taken to that instruction. Miller now complains, however, about the substitution of "to hesitate to act" for "without reservation" in the first sentence, arguing that somehow this conveyed to the jury that proof beyond a reasonable doubt meant something less with respect to the sentencing requirements than it did with respect to finding guilt. He reads *Wills v. State,* 329 Md. 370, 620 A.2d 295 (1993) as making the instruction given at the sentencing hearing inappropriate.

The simple answer is that, as Miller made no objection to the instruction, he has waived his right to complain about it. Maryland Rule 4–325(e); *State v. Rose,* 345 Md. 238, 245–46, 691 A.2d 1314, 1317–18 (1997); *Walker v. State,* 343 Md. 629, 645, 684 A.2d 429, 436 (1996); *Bowman v. State,* 337 Md. 65, 67–68, 650 A.2d 954, 955 (1994). Recognizing the procedural lapse, Miller asks that we review the deficiency under plain error rule. We have defined "plain error" in a jury instruction as "error which vitally affects a defendant's right to a fair and impartial trial" and have limited our review under the plain error doctrine to circumstances which are "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035, 1038 (1980); *State v. Daughton,* 321 Md. 206, 211, 582 A.2d 521, 523 (1990); *Richmond v. State,* 330 Md. 223, 236,

623 A.2d 630, 636 (1993); *Ayers v. State,* 335 Md. 602, 627–28, 645 A.2d 22, 34 (1994).

■■■■ We do not see any such error in the instruction given at the sentencing proceeding, and thus conclude that Miller has, indeed, waived his complaint. Had we reached the issue, however, we would have found no error at all in the instruction.

In *Wills,* we reversed a conviction because the rather rambling reasonable doubt instruction given was "confusing and misleading" and "lean[ed] towards the preponderance standard rather than the reasonable doubt standard." *Wills v. State, supra,* 329 Md. at 387, 620 A.2d at 303. Although, in a concurring opinion, Judge McAuliffe wisely suggested that trial judges "closely adhere" to Maryland Criminal Pattern Jury Instruction 2:02 when attempting to define "reasonable doubt,"—the instruction given at the guilt/innocence stage of trial—the Court did not impose that as a requirement or suggest that including "hesitate to act" in place of "without reservation" would make the instruction erroneous. We confirmed that in *Hunt v. State,* 345 Md. 122, 151–52, 691 A.2d 1255, 1269 (1997). We find nothing confusing or misleading about the instruction. Indeed, by using the "hesitate to act" language, the court probably gave Miller more, not less, than he was entitled to receive, as it suggested that, if the jury even had to take time to think about the matter, it would have a reasonable doubt.

### D. Instructions Regarding Weighing of Mitigating and Aggravating Circumstances

The court's instructions at sentencing focused on the written Findings and Sentencing Determination sheet that was submitted to the jury in conformance with Maryland Rule 4–343(h). Section I asked whether Miller was a principal in the first degree in Shen's murder. Section II asked whether the two aggravating factors alleged by the State had been proved. Section III dealt with mitigating circumstances.

In its instructions regarding mitigating circumstances and Section III, the court defined a mitigating factor as "anything about the Defendant or about the facts of this case that in fairness and in mercy may make the death sentence an inappropriate penalty for this Defendant" and stated that "each of you must determine for yourself whether any mitigating circumstances exist in this case." The court repeated that "[e]ach one of you should individually consider each mitigating circumstance." The written document gave the jury three choices with respect to each and every mitigating circumstance: (a) that the jury unanimously found by a preponderance of the evidence that the mitigating circumstance *did* exist; (b) that it unanimously found by a preponderance of evidence that it did *not* exist; or (c) that one or more jurors, but fewer than all 12, found by a preponderance of the evidence that the circumstance existed. The jury was instructed in that regard. The court iterated again before leaving Section III that "with respect to the mitigating circumstance, that each of you should consider each circumstance."

Finally, as relevant here, the jury was instructed that "once you consider Section III, mitigating circumstances, you shall then determine whether by a preponderance of the evidence the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances." The court instructed that "[i]f you do not find by a preponderance of the evidence that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances, the sentence shall be life imprisonment," and conversely that "[i]f you *unanimously* find that the State has proven by a preponderance of the evidence that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances, the sentence shall be death." (Emphasis added). Section IV of the sentencing form stated that "[e]ach *individual* juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating

circumstance found by that individual juror to exist." (Emphasis added).

■ Miller proposed an additional instruction regarding the weighing of mitigating and aggravating circumstances and objected to the court's failure to include that instruction. He asked that the court instruct that "[e]ach juror must engage in this weighing process individually and reach his or her own personal decision," and that because "each juror will be weighing the same aggravating circumstance that the jury collectively has determined to exist against their own individual determination of mitigating circumstances ... the actual weighing process of aggravating circumstances against mitigating circumstances could in fact be different for each juror."

Miller avers that his proposed instruction was necessary to implement the mandate of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) that each juror must weigh aggravating circumstances against any mitigating circumstances that the juror individually has found to exist, even if the jury as a whole has not found that mitigating circumstance to exist. He complains that the court's use of the word "you" in describing the weighing process may have been interpreted in the plural rather than the singular sense, that the instruction thus did not properly convey that each juror must make an individual weighing decision, and that the prospect of such a misinterpretation cannot be regarded as corrected by the language in Section IV of the sentencing form.

Although Miller's proposed instruction was not an inappropriate one, there is nothing in *Mills* or in any other decision cited to us that mandates its use. Nor do we find any confusion in the instructions given. In *Mills,* the Supreme Court interpreted the then-existing sentencing form as possibly permitting the jury to conclude that it could not weigh a mitigating circumstance against an aggravating circumstance (and thus to impose a sentence other than death) unless all 12 jurors agreed upon the mitigating circumstance, and, upon that interpretation, concluded that the sentencing scheme was

unconstitutional. While the *Mills* case was pending in the Supreme Court, we changed the sentencing form to eliminate the ambiguity found telling by the Supreme Court, and the Court noted that the new form—the one used in this case—did serve to eliminate the problem. *Mills,* 486 U.S. at 381–82, 108 S.Ct. at 1869, 100 L.Ed.2d at 398–399.

Miller's suggestion that the jurors may not have realized that, in using the pronoun "you," the court was speaking to each of them individually and that the court had therefore regressed to the approach found wanting in *Mills,* is wholly speculative and unpersuasive. The court made abundantly clear that each juror was to determine and weigh individually whatever he or she found would make a death sentence inappropriate, and it repeated that point several times. As we read the instructions, it is clear that the word "you" or "your" was intended in the singular, addressed to each juror individually. When the court intended to refer to the jury collectively, as a body, it added the word "unanimously."

### E. Miranda Violation

When the police eventually found Miller at his apartment just after 9:00 p.m. on the 28th, they removed him from the apartment and talked with him in the hallway. He was not then under arrest, no guns were drawn, he was not handcuffed, and no hands had been laid on him. Without first giving him the *Miranda* warnings, Sergeant Price asked him where he had been all day, to which he responded that he had been playing golf. Officer Kennedy, who had noticed the golf clubs in the closet during the earlier sweep, asked if he had taken his golf clubs with him, to which he responded "yes." When Kennedy informed Price of his earlier observation, Price asked Miller whether he had come home between the time he finished playing golf and went to the shopping mall, and he replied that he had not. He said again that he had taken his golf clubs with him. Finally, he denied having been at the pool and talked with any girls there.

Miller moved to suppress those statements as having been the product of a custodial interrogation *sans Miranda* warnings. After a pre-trial suppression hearing, the court granted that relief and declared the statements inadmissible, and they were not, in fact, admitted at trial. Sweeping that rather critical fact aside (indeed not even mentioning it in his brief), Miller urges that the invalidity of that interrogation tainted not just his responses at the apartment but all of the statements made later at the police station, after he had, in fact, been given his *Miranda* warnings. His argument is answered by *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985):

> "If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."

*Id.* at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232.

Miller's attempt to distinguish *Elstad* is unpersuasive. The interrogation at the apartment, even if custodial in nature, was not coercive, his responses were largely exculpatory, and they had little, if any, influence on the inculpatory statements made later at the police station. He changed his story after being given his *Miranda* warnings, after being informed that Shen's body had been recovered, and after Detective Hill told him that he did not believe Miller's exculpatory explanation. *Compare Fellers v. United States,* —— U.S. ——, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (finding conversation between police and defendant in absence of counsel, *after defendant had been*

*indicted* to be in violation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)).

### F. State's Rebuttal Argument

██ During the sentencing proceeding, Miller produced a former classification counselor at the Baltimore County Detention Center, who testified as to Miller's positive adjustment when he was an inmate at the Center awaiting trial. He also produced a social worker from South Carolina, who had done a family study and who testified about Miller's somewhat chaotic upbringing. In closing argument, defense counsel stressed that testimony in urging the jury to find various mitigating factors.

In his rebuttal closing argument, the prosecutor responded to some of that argument. He suggested that it was not surprising that Miller had behaved himself in jail, because he was not stupid, and starting problems while awaiting trial was "the last thing he needs," that he needed to control himself until the trial was over. The prosecutor pointed that out, he said, because, if Miller was to be sentenced to life in prison, "what's he got to lose?" The prosecutor continued, "I'm in jail, life without parole, get a little trusty action working, I see a young lady guard one day, boom, my predator nature comes out. What are they going to do?" Miller lodged an objection and a motion to strike the comment, which the court immediately sustained and granted.

The prosecutor then turned to the testimony of the social worker, that she did not regard Miller as a predator. The social worker, though occasionally testifying for defendants in capital cases, did predominantly adoption work. The prosecutor remarked, "Here is a woman, who by her own admission and a former life in the Carolinas, South Carolina, I think, decides what parents should or should not be allowed to adopt children and she doesn't think this guy is a predator." Miller again objected, and again the court sustained the objection.

At the conclusion of the rebuttal argument, Miller moved for a mistrial based on the two comments. The court denied

the motion but instructed the jury that, during the argument, there were two objections to the prosecutor's argument, that it had sustained both of them, and that the jury must "completely disregard the comments that were made at that point in time." Keying on the prosecutor's use of the word "predator," Miller regards the comments as so prejudicial as to be beyond remediation by the curative instruction.

The prosecutor's comments need to be taken in context. In her extensive testimony regarding Miller's family history, the social worker described in some detail Miller's violent nature and sexual irregularities. He had been violent with a former girlfriend, Kim, who had ended the relationship as a result. He had been violent with his former wife, Tina, both before and during the marriage. There was a restraining order outstanding against him when he married Tina, and the violence continued throughout the marriage. At least twice, Tina filed charges against him. In 1996, he was required to attend a six-month counseling clinic for batterers as a result of one of those charges. When he was 12 and his sister was eight, he sexually abused her on a regular basis for about a year. His father once caught him in bed with his sister attempting to have intercourse with her. Somewhat in summary, the witness said:

> "He saw women as punching bags. He saw in his own family women as punching bags, women as providers of sex on demand, women as drug partners and women as meal tickets and then women as a source of worry that they're going to leave you or abandon you and there was self fulfilling prophecy in that for John. His women did leave him because he was so abusive."

At the conclusion of his cross-examination of her, the prosecutor asked the social worker whether she would characterize Miller as a sexual predator, and she replied "no." That is the answer to which he was responding in his argument.

On this record, Miller got all to which he was entitled, and perhaps more, when the court sustained his objections and gave the curative instruction. There was no abuse of discre-

tion in denying the motion for mistrial. Given what it heard from the social worker, the jury could not possibly have been prejudiced by the prosecutor's brief comments, which it was instructed to disregard in any event.

### G. Constitutionality of Death Penalty Statute

■ Miller makes what appears to be a dual attack on the death penalty law. The first, hinged on *Apprendi* and *Ring,* we have already addressed. The second is that it is unconstitutional to require a defendant to establish mitigating factors by a preponderance of evidence and to establish that non-statutorily enumerated mitigating circumstances are, in fact, mitigating circumstances. We have rejected that argument on a number of occasions, most recently in *Ware v. State,* 360 Md. 650, 712–13, 759 A.2d 764, 797 (2000), and see no reason to rule differently now.

### H. Initial Search of the Apartment

■ The initial search of Miller's apartment, in an effort to determine whether Shen was inside, occurred between 7:45 and 8:00 p.m. on the 28th. Miller moved to suppress "observations made" during that limited search, which the court denied on the ground that the police had a reasonable basis for believing that an emergency existed. Miller urges that there was no emergency and that the warrantless search was therefore unlawful. Shen, he says, had been missing for only three hours and there was no sign of foul play. The discovery of the golf clubs in the closet, he says, served to taint everything that occurred thereafter, as it led the police to disbelieve his story about having played golf that day. There is utterly no merit to Miller's complaint.

At the time, the police had the following information. A 17–year–old young woman, described by her mother and friends as a responsible person, with no alcohol or drug problems, who had never run away before and had no reason to do so then, had accepted a babysitting job with a man named John. This man had been to the apartment pool and therefore presumably lived in the apartment complex. He had been seen

driving a Geo Tracker. Shen had promised to page her friends by 10:00 that morning and had not done so. No one had heard from her, and she had not reported for work at 5:30. She had effectively been missing for about ten hours, not three hours as Miller suggests. Her friends and her mother had said that it was very unusual for Shen to be out of touch.

The police began doing house-to-house checks and conducting interviews. A helicopter searched for both Shen's car and the Geo Tracker. One officer learned from a nearby convenience store that a man named John Miller had worked at the store, that he had been fired, and that he drove a Geo Tracker with New York tags. The store provided a telephone number, which the police traced to Apartment B3 at 415 Valley Meadow Circle, in the Bentley Park Apartment development. A records check revealed a prior false imprisonment charge against Miller. The descriptions the police received of Miller matched that of the person named John described by Jessica and Lauren. Based on that information, Sergeant Price authorized officers to knock on the door of Miller's apartment and, if there was no response, to secure a key and enter the apartment. They were to see if Shen was inside and to check for her well-being. Sergeant Price directed the officers to search in places where a person could be, but not to go into any drawers or small places where a person could not be. According to Price, "it was just a quick sweep of the apartment for safety reasons and then they left."

In *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486, 498 (1978), the Supreme Court noted that it had "recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." In that case, the exigency was to investigate a fire in the building. In *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978), the Court confirmed that it did not question the right of the police to respond to emergency situations, and that "[n]umerous state and federal cases have recognized that the Fourth Amendment does not bar

police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Quoting from *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.1963), the Court made clear that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *See also Oken v. State,* 327 Md. 628, 644–45, 612 A.2d 258, 266 (1992) and *Burks v. State,* 96 Md.App. 173, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451(1993).

We have no hesitation in concluding that, on the information available to the police at the time, they acted in the reasonable belief that an exigent circumstance existed that justified the brief and limited entry into Miller's apartment. The police were looking for a teenager who had disappeared without any reason, who had accepted a babysitting job with a stranger linked to that apartment and had never returned from it. This was not a criminal investigation clothed as a caretaker function, but a legitimate effort to locate and assist a child who may have been in trouble. The initial objective was not to search the apartment, but to inquire of anyone present as to Shen's whereabouts. The entry occurred only because no one was home. The entry and limited search were valid.

### I. Instruction Regarding Victim Impact Evidence

At the sentencing proceeding, Shen's mother testified briefly about the impact of Shen's death on her and on Shen's older sister and younger brother. The testimony covers only two-and-a-half pages, but it was, as expected, poignant. A letter from Shen's father was also introduced. This kind of victim impact evidence is permitted by statute and by case law. *See* Maryland Code, §§ 11–402—11–404 of the Criminal Procedure Article; Art. 41, § 4–609(d); *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Conyers v. State,* 354 Md. 132, 177–78, 729 A.2d 910, 934 (1999) and cases cited there. Miller does not challenge the victim impact evidence itself, but rather the instruction given to the jury concerning it.

In the first part of its instructions, the court instructed the jury regarding the kind of evidence it heard and its role in considering that evidence. As part of those instructions, the court noted that the jury had heard or seen testimony or statements by members of Shen's family, and it informed the jury:

"This testimony and these statements are known as victim impact. It should be given whatever weight you feel it deserves. The victim impact should not be considered by you in determining whether the Defendant is a principal in the first degree or whether the aggravating circumstances exist. You may consider these statements in determining, pursuant to my instructions to you and the verdict form, whether the sentence shall be death, life without parole or life. Victim impact describes the nature of the harm caused by the Defendant."

Miller had submitted an alternative victim impact instruction, and, when the court completed its instructions, he commented that his proposed instruction is "far more instructive and explains in much more detail how the evidence is to be used." The instruction given, he said, "is entirely too concise and does not fully explain each and every detail." Miller asked that four particular paragraphs of his proposed instruction be added. Finding its instructions adequate, the court denied the request.

Two of the paragraphs sought by Miller essentially repeated the admonitions given by the court that victim impact evidence could not be used in determining whether Miller was a principal in the first degree or in determining whether an aggravating circumstance existed. The other paragraphs would have informed the jury that victim impact evidence could never serve as the basis for making a defendant eligible for the death penalty, that it did not constitute an aggravating circumstance of its own, and that it could not be considered in determining whether the aggravating circumstances outweigh any mitigating circumstances. Those points were made clear in other instructions governing the aggravating circumstances

the jury was to consider and how it as to weigh those circumstances against any mitigating circumstances.

The principal argument made now by Miller is that the instruction that victim impact evidence "should be given whatever weight you feel it deserves" allowed the jury to give too much weight and improper weight to the evidence. He concedes that his current argument is "arguably not covered by the oral exception or the submitted instruction" but asks that we consider it under the plain error doctrine. Whether covered or not, there is no plain error. The court made clear that the jury could not consider the victim impact evidence in determining whether Miller was a principal in the first degree or in determining the existence of an aggravating factor. The jury certainly was free to use that evidence with respect to its consideration of mitigating factors and in the weighing process and, as the court instructed, to give it, in those contexts, whatever weight the jury felt it deserved.

### J. Submission of Robbery as an Aggravating Circumstance

The State offered two aggravating circumstances in its quest for the death penalty—that the murder was committed in the course of a first degree sexual offense and that it was committed in the course of a robbery. The latter was based on the fact that Miller stole Shen's purse and her wallet. Miller moved on two occasions to strike both aggravating factors, and on both occasions the court denied the motion and ultimately submitted both aggravating factors to the jury. Defense counsel argued to the jury that the robbery was an after thought—that the purse was taken after Shen was dead and that the killing was not, therefore, committed in the course of the robbery. That argument found favor with the jury which, as noted, found that the State had failed to prove that the murder was committed in the course of a robbery. The jury obviously had a different view about the sexual offense, as it found that the State *had* proved that the murder was committed in the course of that offense.

About five months after the verdicts were returned, this Court decided *Metheny v. State,* 359 Md. 576, 755 A.2d 1088 (2000), in which we confirmed that, when robbery is alleged as an aggravating circumstance in a death penalty case, the State must prove that the murder was committed with or in further-ance of the robbery—that the murder "must have been con-nected to the aggravating crime by more than mere coinci-dence, therefore eliminating from death penalty consideration a robbery committed as an afterthought." *Id.* at 618, 755 A.2d at 1111. In a motion for new trial, heard after *Metheny* was filed, Miller again complained that the robbery offense should not have been submitted as an aggravator because there was no evidence that the murder occurred in connection with the robbery. The court denied the motion, and the issue is raised again in this appeal.

There is, of course, one huge difference between this case and *Metheny.* In *Metheny,* the only aggravating factor sub-mitted to the jury was that the murder was committed in the commission of a robbery, and the death penalty returned by the jury thus rested solely on that aggravating circumstance. The only evidence in that case was that Metheney's "concep-tion of the design to rob [the victim] of her clothing and purse was not formed until after the murder" and we therefore held that "[b]ecause the intent to steal was formed after the murder, a rational trier of fact could not have found that [Metheney] murdered [the victim] while committing the rob-bery." *Id.* at 631, 755 A.2d at 1118–19. Here, as noted, the jury dismissed the robbery as an aggravating factor. *Methe-ny* does not assist Miller.

Citing *Brooks v. State,* 299 Md. 146, 472 A.2d 981 (1984) and *Sherman v. State,* 288 Md. 636, 421 A.2d 80 (1980), Miller complains that the very submission of the robbery as an aggravator may have tainted the jury in finding that the murder was committed in the course of a first degree sexual offense, and that the death sentence should be annulled for that reason. He is wrong for two reasons. First, there was no direct evidence in this case of *when* Miller formed an intent to rob Shen. The jury obviously did not believe, beyond a

reasonable doubt, that Miller took anything of value from Shen while she was still alive, but it could have so found. If the jury had credited Miller's statements that Shen was alive when he left her in the car to die, the murder would, indeed, have been committed in the course of the robbery, as he took her purse and wallet when he left her in the car. In fact, he had possession of those items when he put Shen in the car and he never did anything to indicate an intent to return them to her.

Even if the court *did* err in submitting the robbery as an aggravating circumstance, *Brooks* and *Sherman* do not help Miller, as both are distinguishable. In *Brooks,* the defendant was charged with a variety of offenses, including armed robbery, conspiracy to commit armed robbery, and carrying a deadly weapon with intent to injure, all arising out of the murder of one Keith Bee during an armed robbery. At the close of the State's case, the court found insufficient evidence to sustain the conspiracy charge and granted a judgment of acquittal on that count. At the prosecutor's urging, the court later reconsidered that ruling and submitted all three counts to the jury, which convicted of all three. We reversed the conspiracy conviction on double jeopardy grounds—that once a judgment of acquittal had been entered by the court, the charge could not be revived and submitted to the jury. Because all three charges not only stemmed form the same incident but "were interrelated," we could not declare a belief beyond a reasonable doubt that the wrongful submission of the conspiracy charge did not taint the jury's consideration of the other charges as well, so we reversed them as well.

Unlike in *Brooks,* there was no inter-relationship here between the sexual offense and the robbery. The issue as to the robbery, as an aggravator, was whether the intent to steal Shen's property was formed before or while Miller was strangling her and leaving her to die, or afterward. Did he take the purse and wallet as an afterthought, as he claimed, or had he intended to take the property earlier? The robbery had nothing whatever to do with the sexual offense, however. The issues as to that offense were (1) whether the sexual activity

was consensual on Shen's part, and (2) whether the murder occurred after it was completed. There is no inter-relationship whatever between the two offenses and thus no possibility that the jury's *unfavorable* consideration of the robbery tainted its consideration of the sexual offense.

In *Sherman,* the defendant, a lawyer, was charged with five offenses arising from the unauthorized personal use of client funds. During the trial, the court entered judgments of acquittal on two of the counts, but then allowed the entire indictment, containing those two counts, to go to the jury room. That was in clear violation of a Rule of this Court that allowed charging documents to go to the jury only to the extent that they reflected charges upon which the jury was to deliberate: "dead" counts were not permitted to go to the jury. In reversing, we noted that, prior to the adoption of that rule, the judge had discretion as to what was allowed in the jury room and that the Court adopted the Rule because of concern over the potential prejudice arising from the submission of counts that had previously been eliminated. The decision to reverse was not a Constitutional one but rested entirely on the mandate of the Rule which, as a "precise rubric," was to be read and followed. No "dead" counts were submitted to the jury in this case.

### K. Sufficiency of Evidence of Sexual Offense

■ Miller contends that the evidence was legally insufficient to establish that the murder was committed in the commission of a first degree sexual offense. Under former Maryland Code, Art. 27, § 464 (and current Criminal Law Art. § 3–305), a person is guilty of a first degree sexual offense if the person engages in a "sexual act" with another by force or threat of force and without the consent of the other, and suffocates, strangles, or inflicts serious physical injury on the victim in the course of committing the crime. A sexual act was defined in Maryland Code, former Art. 27, § 461(e) (current Criminal Law Art. § 3–301(e)) as including cunnilingus, which was the act relied upon by the State to establish the offense and which falls within the colloquial term "oral

sex." Under former Art. 27, § 413(d)(10) (current Criminal Law Art. § 2–303(g)(x)), it is an aggravating factor, for purposes of the death penalty, if the defendant committed the murder while committing or attempting to commit a sexual offense in the first degree.

Miller admitted in his statement to the police and in some of the telephone calls overheard by police officers that he engaged in oral sex with Shen. He complains, however, that there was no corroboration of those statements and that there was no evidence that the oral sex was not consensual, as he maintained. He overlooks the medical examiner's testimony regarding the various bruises and abrasions on Shen's body, from which a reasonable inference can be drawn that she did, indeed, resist and that the sexual activity was both violent and non-consensual. He also brushes aside the testimony of Bobbitt that "he tried to seduce her. She said no. Threw her on the bed. He smacked her, ripped her top off, started sexually assaulting her." Miller blithely notes that Bobbitt said nothing about oral sex. He did not need to: "sexually assaulting her" will do. The jury was not required to believe Miller's far-fetched story that a 17–year–old young woman who had a boyfriend, who was lured to Miller's apartment with an offer of a babysitting job, and who did not know Miller, would willingly consent to engage in sexual activity with him after being informed that the babysitting job was a ploy.

### L. Failure to Instruct on Corroboration of Felony

██ Upon the wholly mistaken premise that the only evidence supporting the charge that he committed a first degree sexual offense came from his own statements to the police and overheard by the police, Miller argues that the court erred in failing to instruct the jury of the need for those statements to be corroborated. He acknowledges that he did not ask for such an instruction or object to the omission to give one, but insists that we address his complaint under the plain error doctrine. We find no plain error, and thus conclude that the complaint was waived. Even if we were to address the complaint, however, we would find no error.

██ Maryland follows the general rule that, as a matter of substantive law, a criminal conviction cannot rest solely on an uncorroborated confession. *See Woods v. State*, 315 Md. 591, 615–16, 556 A.2d 236, 248 (1989). We have made clear, however, that it is not necessary for the corroborating evidence to be "full and complete or that it establish the truth of the *corpus delicti* either beyond a reasonable doubt or by a preponderance of proof." *Cooper v. State*, 220 Md. 183, 190, 152 A.2d 120, 124 (1959); *Woods v. State, supra*, 315 Md. at 616, 556 A.2d at 248. The supporting evidence, we have said, "may be small in amount" and is sufficient to establish the *corpus delicti* "if, when considered in connection with the confession or admission, it satisfies the trier of facts beyond a reasonable doubt that the offense charged was committed and that the accused committed it." *Bradbury v. State*, 233 Md. 421, 424–25, 197 A.2d 126, 128 (1964); *Woods v. State*, 315 Md. at 616, 556 A.2d at 248. These precepts, which have been stated many times, were confirmed more recently in *Ballard v. State*, 333 Md. 567, 636 A.2d 474 (1994).

Miller's admissions came in three forms—his oral and written statements to the police, the statements he made on the telephone that were overheard by the police, and the admission he made to Clarence Bobbitt. There was independent forensic evidence that he had ejaculated on Shen, which certainly established that sexual activity of some kind was committed, and there was medical evidence of contusions and abrasions on Shen's head and much of her body, from which a reasonable inference could be drawn that the activity was violent and non-consensual. We made clear in *Ballard* that the corroborating evidence need only establish the *corpus deliciti* generally and need not establish "each component element of the *corpus delicti*." 333 Md. at 577, 636 A.2d at 478, quoting from *Ball v. State*, 57 Md.App. 338, 351, 470 A.2d 361, 368 (1984), *modified on other grounds sub nom. Wright v. State*, 307 Md. 552, 515 A.2d 1157 (1986). It is not necessary, therefore, that the corroborating evidence establish the precise method by which the sexual offense was perpetrated. The corroborating evidence here more than sufficed, so there

was not only no plain error material to Miller's rights in the court's failure to give an instruction that was never requested, but no error at all.

## M. Impeachment of Defense Expert

At the sentencing proceeding, the defense presented Dr. Caroline Burry, a social worker from South Carolina, to testify regarding Miller's family, social, and personal history. The prosecutor attempted to impeach her credibility in a number of ways. Miller complains here about two lines of questions.

Maryland Rule 4–343(d), which is part of the Rule governing sentencing proceedings in death penalty cases, provides that, upon request of the State after the defendant has been found guilty of murder in the first degree, the defendant must produce and permit the State to inspect and copy "all written reports made in connection with the action by each expert the defendant expects to call as a witness at the sentencing proceeding" but must furnish only "the substance of any such oral report or conclusion." In this case, the State made such a request, but no written report was ever produced. It seemed evident from Dr. Burry's testimony that she had made extensive written notes but had not actually made a written report, and she was questioned about that. She said that she was aware that, if she prepared a written report, the defense would have been required to turn it over to the prosecutor, and the prosecutor, in closing argument, suggested to the jury that, by not preparing a written report, the defense was "keeping it from us."

Although no objection was made to that comment in closing argument, Miller now argues that it was impermissible even to pose the questions to Dr. Burry. He suggests that the decision not to prepare such a report was made by defense counsel, and not by Dr. Burry, and that it was unfair to use the absence of a report to impeach her credibility. We find nothing impermissible about the questions. For one thing, the record does not support Miller's current suggestion that the decision not to prepare a written report was made by defense

counsel. Dr. Burry testified that she was not asked to make a written report but that she was not told not to make such a report. It would appear from that testimony that the decision not to prepare a written report was, indeed, made by her. Who made the decision is unimportant in any event. It is fair and relevant for the State to inquire why the expert, who spent more than 70 hours on her investigation and who was fully aware of the disclosure requirement, would make extensive written notes to guide her testimony, including a written geneogram of Miller's family tree, but fail to make a written report, and to suggest that the reason was to avoid having to disclose the report to the State.

■ The second line of questioning challenged by Miller concerned three people interviewed by Dr. Burry—Miller's former girlfriend, Kim Ruhl, his cousin, Phil Gardner, and his Aunt Carol. The prosecutor asked Dr. Burry whether Ms. Ruhl appeared to have any physical impediment that would prohibit her from moving about freely, and, over objection, the witness said "no." The same question was put, and, over objection, answered, with respect to Gardner and Aunt Carol. Miller treats these questions as raising the question of why those witnesses could not have come to Maryland to testify and, as a result, as an attack on his ability to use hearsay statements as part of a social history report, which we declared permissible in *Whittlesey v. State*, 340 Md. 30, 665 A.2d 223 (1995).

■ We find no basis for such an argument. Statements made by those persons to Dr. Burry were admitted without objection, so there clearly was no conflict with *Whittlesey*. Even when a person's extra-judicial statements are admissible under some exception to or relaxation of the hearsay and best evidence rules, it is fair to inquire whether there is any impediment to the person appearing in court and testifying directly, subject to cross-examination. Such an inquiry goes not to the admissibility of the statements but to the weight to be given to them.

### *N.   Probable Cause for Miller's Arrest*

Claiming that, at the time of his arrest, the police had no reason to believe that Shen had been harmed in any way and thus no probable cause to believe that any felony had been committed, Miller avers that his warrantless arrest was unlawful.   The State responds that the issue is not preserved for appellate review and, in any event, has no merit.

In an omnibus motion under Maryland Rule 4–252, Miller did ask, among other things, that all evidence seized from his person "at or about the time of the arrest" be suppressed because such evidence "was seized unlawfully, absent probable cause, and in violation of the United States Constitution, the Maryland Declaration of Rights and other legal rights of this Defendant."   As we recently pointed out in *Denicolis v. State*, 378 Md. 646, 837 A.2d 944 (2003), Maryland Rule 4–252(e) requires that motions in criminal cases state the ground upon which they are made and contain a statement of points and citation of authorities.

The purpose of that Rule, we added, is "to alert both the court and the prosecutor to the precise nature of the complaint, in order that the prosecutor have a fair opportunity to defend against it and that the court understand the issue before it."   *Id.* at 660, 837 A.2d at 952.   As in *Denicolis*, this aspect of Miller's omnibus motion gave no details supporting his bald contention that evidence was seized from him "at or about the time of the arrest" without probable cause.   Nor, as was also the case in *Denicolis*, did Miller ever pursue the matter at the hearing on the motion.   Although he pressed his complaint about evidence seized during a search of the apartment, pursuant to a warrant, he never mentioned, and thus effectively abandoned, any contention that the arrest itself, or any search incident to it, was without probable cause.   If we had reached the issue, we would have found no merit in it.

Miller's premise, that the police lacked any knowledge that a felony had been committed, is simply not accurate.   By the time Miller was arrested, Shen had been missing for more than ten hours.   As we have indicated, the police knew that

she was supposed to meet Miller at about 9:30 that morning for a babysitting job, that she had promised to call or page her best friends, Lauren or Jessica, by 10:00 a.m., when she arrived at his apartment, that she had not called at any time during the day, and that she had failed to show up for work at 5:30 that evening.  They knew that she was a responsible person with no history of drug or alcohol abuse and no reason to run away, and that it was most unusual for her not to keep in touch with her friends.  They knew that Miller had a prior charge of false imprisonment in New York and they knew that his alibi—that he had been playing golf all afternoon—was probably not true, as they had seen his golf clubs in his closet. They had observed him acting in a suspicious and surreptitious manner when, in the dark, he approached the apartment in his car without lights on and, upon seeing Officer Arrington's police car, backed away.  When Lauren and Jessica positively identified him as the person they had seen at the pool, they had ample probable cause to believe that he was involved in Shen's disappearance, and, given the circumstances, could reasonably believe that several different felonies may have been committed, ranging from a criminal homicide, to a first or second degree rape or sexual offense, to a kidnapping.

### O.   Sexual Offense—Evidentiary Sufficiency

Miller's argument here is a repetition of the argument we addressed in Part K, above, and merits no further consideration.

### P.   Failure to Instruct on Corroboration of Sexual Offense

This argument is a repetition of the argument we addressed in Part L, above, and merits no further consideration.

### Q.   Instruction on Mitigating Circumstances

As we indicated earlier, the court's instructions at the sentencing proceeding focused, to a large extent on the verdict form that the jury had and would be required to complete.

Section III of the form deals with mitigating circumstances. The court defined a mitigating circumstance as "anything about the Defendant or about the facts of this case that in fairness and in mercy may make the death sentence an inappropriate penalty for this Defendant." The court instructed that "[s]o long as such factors are raised by the evidence, you may consider them as a mitigating factor," but it expressly defined "evidence" for this purpose as having "a far broader meaning than just testimony and exhibits." In that regard, it said that "mercy, compassion, sympathy or the appropriateness of a sentence other than death need not necessarily be by the testimony or exhibits." The court repeated, when focusing on non-statutory factors, that the jury could consider evidence relating to the Defendant's background "as well as relevant and material conduct of the Defendant up to, and including, this sentencing proceeding."

Miller complains that instructing the jury that a mitigating factor must possess an evidentiary basis is inconsistent with the notion that anything can be a mitigating factor. That same argument was made and rejected by us in *Conyers v. State,* 354 Md. 132, 172–73, 729 A.2d 910, 931 (1999). The complaint there was that, throughout its instructions on mitigating factors, the court had used the phrase, "based on evidence." We admonished judges to give precisely the instruction given in this case—that a mitigating factor is "anything relating to the defendant or the crime which causes [the jury] to believe that death may not be appropriate"—and to make clear that, as used in the sentencing form, the word "evidence" has "a far broader meaning than just testimony and exhibits." *Id.* at 168, 729 A.2d at 929.

Although no objection had been made by Conyers to the instruction, we held that no plain error had been committed. We observed that he was focusing on a single line in the jury instructions rather than on the instructions as a whole. Noting that, as here, the jury had been told that it could consider anything presented during the sentencing proceeding. including "relevant and material conduct of the defendant up to and including this sentencing proceeding," we held that the thor-

oughness of the court's instructions "effectively precluded a juror from not considering a factor he or she perceived as mitigating because it was not 'raised by the evidence.' " We perceive no error.

## CONCLUSION

For the reasons noted, the verdicts and the prison sentences will be affirmed, the death sentence imposed on the murder conviction will be vacated, and the case will be remanded for a new sentencing proceeding on the murder conviction.

JUDGMENTS ENTERED ON CONVICTIONS FOR FIRST DEGREE SEXUAL OFFENSE, ROBBERY, AND FALSE IMPRISONMENT AFFIRMED; VERDICT ENTERED ON MURDER CONVICTION AFFIRMED; SENTENCE OF DEATH IMPOSED ON MURDER CONVICTION VACATED; CASE REMANDED TO CIRCUIT COURT FOR ALLEGANY COUNTY FOR NEW SENTENCING PROCEEDING ON THAT CONVICTION; COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–HALF BY BALTIMORE COUNTY.

RAKER, Judge, concurring in part and dissenting in part.

### I.

I would reverse the death sentence, affirm the guilty verdicts, and affirm the prison sentences in this case. I would remand for a new sentencing proceeding on the murder conviction. I join the majority opinion excepting Part II A, *Apprendi* and *Ring.*

### II.

I would hold that the portion of Maryland Code (1957, 1996 Repl.Vol.) Article 27, § 413(h) [1] that provides that punishment

---

1. This case was tried prior to the 2002 Code recodification. For that reason, unless otherwise indicated, all statutory references are to Maryland Code (1957, 1996 Repl.Vol.) Article 27.

shall be death if the sentencing authority[2] finds that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence violates due process under the Fourteenth Amendment and the Sixth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights. I adhere to my views expressed in the dissent in *Oken v. State*, 378 Md. 179, 835 A.2d 1105 (2003) (Raker, J., dissenting, joined by Bell, C.J. and Eldridge, J.) and in *Borchardt v. State*, 367 Md. 91, 786 A.2d 631 (2001) (Raker, J., dissenting, joined by Bell, C.J. and Eldridge, J.), stating that the sentencing authority must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt and not by a preponderance of the evidence. I would sever the unconstitutional portion of the statute, require the reasonable doubt standard to be applied as a matter of law, and vacate appellant's sentence of death imposed pursuant to § 413.

Under the Maryland death penalty scheme, the State must give notice of an intent to seek the death penalty and allege in that notice, the existence of a statutory aggravating factor. With the exception of a contract murder and the killing of a law enforcement officer, the jury must find that the State has proven, beyond a reasonable doubt, that the defendant was a principal in the first degree. The jury must find that the State has proven, beyond a reasonable doubt, the existence of at least one aggravating factor. The jury must also find that the aggravating factors outweigh the mitigating factors. The statute states that the sentence shall be death if the jury finds that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence. This finding is a necessary predicate to the imposition of a sentence of death. In my view, the jury must find this last and ultimate "finding" beyond a reasonable doubt.

---

**2.** Future references to the sentencing authority will be to a jury, with the recognition that the defendant may waive the right to have the sentence determined by a jury and may elect to have the court sentence. *See* Art. 27, § 413(b)(3), (k)(3).

*Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in the framework of the Maryland death penalty statute, mandate that the jury must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt and not by a mere preponderance of the evidence. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455. *Ring* made clear that *Apprendi* applied to death penalty proceedings, reasoning that "[c]apital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564.

The maximum sentence for first degree murder in Maryland is life imprisonment. Life imprisonment without the possibility of parole and death are enhanced penalties and may not be imposed unless the State meets the statutory requirements justifying enhancement. The Maryland statutory scheme requires that before a sentence of death may be imposed, the jury must make certain additional findings beyond the finding of guilt of the murder. Those findings increase the maximum penalty from life to death.

The plain language of the Maryland death penalty statute requires certain findings during the weighing stage as an absolute precondition for the imposition of the death penalty, a determination on which the Maryland General Assembly conditioned an increase in the penalty from life imprisonment to death. These findings are, at a minimum, partially factual and are quintessentially *Apprendi* type findings, requiring proof beyond a reasonable doubt.

The penalty for first degree murder in Maryland is "death, imprisonment for life, or imprisonment for life without the possibility of parole." § 412(b). The sentence shall be im-

prisonment for life *unless* a sentence of death is imposed in accordance with § 413. *Id.* The statute mandates that the jury first consider and *find,* beyond a reasonable doubt, whether any alleged aggravating circumstances exist. § 413(d) & (f). The jury must then consider and *find,* by a preponderance of the evidence, whether one or more mitigating circumstances exist. § 413(g). Finally, the jury must determine, by a preponderance of the evidence, whether the aggravating circumstances outweigh the mitigating circumstances.[3] § 413(h)(1). If the jury *finds* that the aggravating circumstances outweigh the mitigating circumstances, "the sentence shall be death." § 413(h)(2). The trial court is then instructed to impose a sentence as decided by the jury. § 414(k)(1). After sentence is imposed, Maryland Rule 4–343(k) requires the trial judge to promptly prepare, send to the parties, and file with the Clerk of the Court of Appeals a report in the form prescribed by the Rule, including a recommendation of the trial court as to whether imposition of a death sentence is justified. The statute requires the Court of Appeals to review the imposition of the death penalty and, *inter alia,* to determine "[w]hether the *evidence* supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances." § 414(e)(3) (emphasis added).

In *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001), a divided Court held that the Maryland death penalty scheme does not run afoul of *Apprendi* and that the statute passes constitutional muster. The Court rejected appellant's arguments in that case on three grounds: (1) that *Apprendi* did not apply to capital sentencing schemes; (2) that the maximum penalty for first degree murder in Maryland was death and that Borchardt did not receive a sentence in excess of the statutory maximum; and (3) that *Apprendi* is inapplicable to the weighing of aggravators against mitigators because the process is a purely judgmental one and the weighing process is a sentencing factor. In rejecting appellant's arguments in *Borchardt,* the majority reasoned as follows:

---

3.  Maryland is regarded as a "weighing" state.

"Perhaps the easiest answer lies in the unequivocal statement by the *Apprendi* majority that its decision did not render invalid State capital sentencing schemes, such as approved in *Walton[ v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)], that allowed the judge, not sitting as the trier of fact, to find and weigh specific aggravating factors. If it is permissible under *Apprendi* for the law to remove that fact-finding and fact-weighing process *entirely* from the jury and leave it to the judge as a legitimate sentencing factor, without specifying a reasonable doubt standard, it can hardly be impermissible for a jury that has found the prerequisite aggravating factors beyond a reasonable doubt to apply a preponderance standard in weighing them against any mitigating circumstances. The *Walton* scheme, in other words, is in far greater direct conflict with the underpinning of *Apprendi* than the Maryland approach. Thus, if the aggravating circumstances do not constitute elements of the offense or serve to increase the maximum punishment for the offense in the *Walton* context, they cannot reasonably be found to have that status under the Maryland law. *If Apprendi renders the Maryland law unconstitutional, then, perforce, it likely renders most of the capital punishment laws in the country unconstitutional.* We cannot conceive that the Supreme Court, especially in light of its contrary statement, intended such a dramatic result to flow from a case that did not even involve a capital punishment law."

*Id.* at 121–22, 786 A.2d at 649 (footnote omitted).

That reasoning was wrong. The majority in *Oken* acknowledged that it was wrong. *See Oken,* 378 Md. at 254, 835 A.2d at 1148–49. As a result, the foundation of the majority's reasoning set out in *Borchardt* no longer exists. In *Ring v. Arizona,* 536 U.S. at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564, the Supreme Court expressly overruled *Walton* because the reasoning in *Apprendi* is "irreconcilable" with the holding in *Walton.*

The Court, in *Oken,* relied on the third *Borchardt* prong— the only one the majority found to survive *Ring. See Oken,*

378 Md. at 258, 835 A.2d at 1151. The Court maintained that "the weighing process is purely a judgmental one, of balancing the mitigator[s] against the aggravator[s] to determine whether death is the appropriate punishment in the particular case. This is a process that not only traditionally, but quintessentially is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt." *Id.* at 208, 835 A.2d at 1121–22 (quoting *Borchardt,* 367 Md. at 126–27, 786 A.2d at 652).

*Ring* and *Apprendi* entitle a capital defendant to a jury determination of the facts on which eligibility for a death sentence is predicated. In *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455 (2000), the Supreme Court held that regardless of the labeling by a State, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court made clear that "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457.

In *Ring,* the Supreme Court held the Arizona death penalty statute unconstitutional because under that statute, a judge, rather than a jury, was required to determine the existence of an aggravating factor, thereby making the factual findings prerequisite to the imposition of the death penalty following a jury determination of a defendant's guilt of first degree murder. *Ring,* 536 U.S. at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 576–77. The Court held that the Arizona statute violated the defendant's Sixth Amendment right to trial by jury. *Id.* The Court expressly overruled *Walton* in favor of *Apprendi's* Sixth Amendment approach, reasoning that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. at 2432, 153 L.Ed.2d at 564. The Court concluded that the Arizona statute was invalid because the "enumerated

aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" and therefore "the Sixth Amendment requires that they be found by a jury." *Id.* at 609, 122 S.Ct. at 2443, 153 L.Ed.2d at 577 (quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19).

Thus, contrary to the majority's assertion in *Borchardt* that *Apprendi* has no application to death penalty sentencing proceedings, the Supreme Court applied the *Apprendi* holding that "the Sixth Amendment does not permit a defendant to be 'expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" *Ring,* 536 U.S. at 588–89, 122 S.Ct. at 2432, 153 L.Ed.2d at 564 (quoting *Apprendi,* 530 U.S. at 483, 120 S.Ct. at 2359, 147 L.Ed.2d at 450).

The *Ring* Court pointed out that every fact that the legislature requires before death may be imposed be found by a jury beyond a reasonable doubt. The Court reiterated that "the dispositive question ... 'is one not of form, but of effect.'" *Ring,* 536 U.S. at 602, 122 S.Ct. at 2439, 153 L.Ed.2d at 572 (quoting *Apprendi,* 530 U.S. at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457). The Court stated:

> "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."

*Id.*

The weighing portion of Maryland's death penalty law violates due process under the Fourteenth Amendment and Sixth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights because the balancing serves as an absolute prerequisite finding to a death sentence and, thus, must be subject to the reasonable doubt standard.[4]

---

4. I need not recount the history of the rule announced in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that due process requires that every fact necessary to the crime charged be proven

Accordingly, under *Ring* and *Apprendi*, the trier of fact must find that the aggravating outweigh the mitigating factors *beyond a reasonable doubt.*

A defendant does not become death-eligible under the Maryland statutory scheme until the jury finds that the aggravators outweigh the mitigators. Under the Maryland statute, the weighing process includes the jury determination that the ultimate penalty of death is the appropriate sentence. Until the jury makes this finding, the defendant is not eligible for a sentence of death.

The maximum penalty for first degree murder in Maryland is life imprisonment; death or life imprisonment without the possibility of parole are *enhanced* sentences for first degree murder, and are dependent upon special circumstances. *See Oken*, 378 Md. at 256–58, 835 A.2d at 1150–51; *Borchardt*, 367 Md. at 154–55, 786 A.2d at 668–69 (Raker, J., dissenting); *Johnson v. State*, 362 Md. 525, 529, 766 A.2d 93, 95 (2001). It is the jury finding that aggravating circumstances outweigh mitigating circumstances that increases the penalty for first degree murder in Maryland beyond the prescribed statutory maximum. *See Johnson*, 362 Md. at 529, 766 A.2d at 95 (holding that "basic sentence" for first degree murder is life imprisonment and that life without parole and death are enhanced penalties); *Gary v. State*, 341 Md. 513, 520, 671 A.2d 495, 498 (1996) (holding that maximum penalty for first degree murder is life imprisonment). Because the default penalty for first degree murder in Maryland is life imprisonment, a jury's

---

beyond a reasonable doubt. *See Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) through *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi* and *Ring*. *See also Borchardt*, 367 Md. at 151–52, 786 A.2d at 667 (Raker, J., dissenting); *Evans v. State*, 304 Md. 487, 550–51, 499 A.2d 1261, 1294 (1985) (McAuliffe, J., dissenting) (reasoning that "the basic principles of [due process as explicated in] *Winship, Mullaney* and *Patterson[ v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)] require[ ] that the burden of persuasion on this ultimate issue must be upon the State, and the jury must be persuaded beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the penalty of death can be imposed").

determination that aggravating circumstance[s] outweigh mitigating circumstance[s] is an additional finding beyond that of guilt that serves to make a defendant eligible for the enhanced penalty of death. *Ring* and *Apprendi* require that such a finding be made beyond a reasonable doubt.

Under Maryland law, jurors are factfinders throughout the entire sentencing procedure. Before the sentencing commences, a defendant must be found guilty of first degree murder and at least one aggravating circumstance must be alleged. The State must then present evidence supporting the aggravating circumstance[s]. The jury then engages in a three-step process and proceeds to each succeeding phase of that process only after it makes findings with respect to the preceding phase. First, the jurors must find at least one aggravating circumstance unanimously beyond a reasonable doubt. Second, the jury determines the existence *vel non* of any mitigating circumstances, based on a preponderance of the evidence standard. Third and finally, the jury weighs the aggravating against the mitigating circumstances. Thus, before a defendant is eligible for the death penalty in Maryland, the jury must determine that the aggravating circumstances outweigh the mitigating circumstances. Included within that determination is the conclusion that death is the appropriate sentence.

Section 413 permits the jury to find as a mitigating circumstance, in addition to those enumerated in § 413(g)(1)-(7), "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." § 413(g)(8). This provision, known as the "catchall" provision, permits a jury to extend mercy, if it is so inclined. *See Grandison v. State,* 305 Md. 685, 756, 506 A.2d 580, 615 (1986). We stated in *Foster v. State,* 304 Md. 439, 474–75, 499 A.2d 1236, 1254 (1985), that the jury, "unconvinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be

appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances."

*Ring* describes a substantive element of a capital offense as one which makes an increase in authorized punishment contingent on a finding of fact. Using this description, the substantive elements of capital murder in Maryland are the jury's finding of the aggravating circumstance[s] necessary to support a capital sentence and the fact that the aggravators outweigh the mitigators. It is the latter finding, that aggravators outweigh mitigators, including the determination that death is appropriate, that ultimately authorizes jurors to consider and then to impose a sentence of death. That is, the increase in punishment from life imprisonment to the death penalty is contingent on the factual finding that the aggravators outweigh the mitigators. Under the statute, then, when the jury finds that the aggravating outweigh the mitigating circumstances, the defendant is exposed to an increased potential range of punishment beyond that for a conviction for first degree murder. *See Harris v. United States,* 536 U.S. 545, 567, 122 S.Ct. 2406, 2419, 153 L.Ed.2d 524, 544 (2002) (plurality opinion) ("Read together, *McMillan[ v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) ] and *Apprendi* mean that those facts setting the outer limits of a sentence, *and of the judicial power to impose it,* are the elements of the crime for the purposes of the constitutional analysis.") (emphasis added). It is evident by reading § 413 and § 414 that the Legislature intended to base a death sentence on a factual finding, first by mandating that the jury find that the aggravators outweigh the mitigators by a specific burden of proof, *i.e.,* by a preponderance of the evidence, and second, by requiring that this Court review that finding for *sufficiency* of the evidence.

Step three, the balancing of the aggravating and mitigating factors, in my view, is a *factual* determination. Unless, and until, the jury finds that the aggravating factor[s] outweigh the mitigating factor[s], the defendant is not eligible for the death penalty. Because it is a factual determination which

raises the maximum penalty from life to death, *Ring* requires that the standard be beyond a reasonable doubt.

Three aspects of the statute show that all three steps in the Maryland death penalty scheme are factual in nature. First, the Legislature has provided for a burden of proof in the weighing process. Second, this Court is mandated to review the jury finding of death for sufficiency of the evidence. Finally, the repeated use of the word "find" suggests the determination of an observable fact, *see Webster's Third New International Dictionary* 852 (1961) (defining "finding" as "the result of a judicial or quasi-judicial examination or inquiry especially into matters of fact as embodied in the verdict of a jury or decision of a court, referee, or administrative body").

A standard of proof has commonly been applied to factual findings. *See Olsen v. State*, 67 P.3d 536, 589 (Wyo.2003) (stating that the language of the statute "that aggravating circumstances be proved beyond a reasonable doubt and mitigating circumstances be proved by a preponderance of the evidence references burdens assigned to *factual issues* ") (emphasis added). The prescription by the General Assembly of a specific burden of proof, ordinarily reserved for factual findings, is the clearest indication that the Legislature envisioned this determination as a factual finding.

The burden of proof consists of two components: the burden of going forward and the burden of persuasion. McCormick on Evidence describes the term as follows: "One burden is that of producing evidence, satisfactory to the judge, of a particular fact in issue. The second is the burden of persuading the trier of fact that the alleged fact is true." *McCormick on Evidence* § 336, at 409 (Strong 5th ed.1999) (footnote omitted). In the context of the weighing of aggravating and mitigating circumstances, we refer to the burden of persuasion. In the ordinary civil case, "proof by a preponderance, seems to be proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." *Id.* at 422. The clear-and-convincing burden of persuasion has been described to mean that a fact is

"proved" only if the evidence leads the factfinder to the conclusion that the truth of the contention is highly probable. *Id.* at 425. As expressed by Justice Harlan, in *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368, 378 (1970) (concurring opinion), the expression of a "choice of the standard for a particular variety of adjudication does . . . reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations." In discussing the function of a standard of proof, he further noted:

> "[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of *factual* conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his *factual* conclusions."

*Id.* at 370, 90 S.Ct. at 1076, 25 L.Ed.2d at 379 (emphasis added).

The Maryland Legislature, in providing for a specific burden of proof, recognized that the weighing process was a factual finding, at least in part, that could be satisfied by a preponderance of the evidence standard. This statute was enacted before the Supreme Court spoke in *Apprendi* and in *Ring.* If the weighing determination is not susceptible of a burden of proof and is merely a judgment call, why would the Legislature have provided for *any* particular burden of proof? As to the two burdens, Justice Stewart of the Utah Supreme Court observed:

> "The 'beyond a reasonable doubt' standard may, of course, be considered similar in its function to proof by a preponderance of evidence, *i.e.,* both standards are used to *resolve factual disputes.*"

*State v. Brown,* 607 P.2d 261, 275 (Utah 1980) (emphasis added). The Court, in *Oken,* characterized Oken's contention regarding "factfinding" as merely semantics. 378 Md. at 260,

835 A.2d at 1152. It is form over substance to rely upon labels to avoid the application of *Ring* and *Apprendi* to the Maryland death penalty statute.

The Maryland Legislature has provided for automatic review by the Court of Appeals of the jury's sentence of death for "sufficiency of the evidence." § 414. The Legislature could not have conceived of the death penalty sentencing determination as a "purely judgmental choice" if it provided for appellate review of the *sufficiency of the evidence,* a traditional review of findings of fact. The Legislature established the sentence of death as an enhanced penalty, to be imposed upon the establishment of additional facts (with the ultimate factual finding that the aggravating factors outweigh the mitigating factors) by a particular standard of proof that is reviewable, as a matter of law, at the appellate level.

Commentators recognize that balancing aggravating against mitigating circumstances is a factfinding process. For example:

"Although there are many variations among the capital sentencing statutes currently in existence, most of these statutes employ a common, *tripartite fact finding process* that involves the sentencer's making *factual findings on three different issues:* the existence of aggravating circumstances; the existence of mitigating aspects of the defendant's character, record, or offense; and *whether the aggravating circumstances outweigh the mitigating circumstances.* The portion of this tripartite structure that has been the central focus of Sixth Amendment scrutiny up to this point has been the first prong: fact finding on the existence of aggravating circumstances. This was the fact finding determination that the now-overruled *Walton* decision and its jurisprudentially linked predecessor, *Hildwin,* deemed suitable for a judge. And it is the factfinding determination that *Ring,* in overruling *Walton,* reserved for the jury. In the wake of *Ring,* the inevitable next questions for resolution are whether the *Ring* rationale requires a jury also to make the second and third *fact finding* determinations—the determination of the exis-

tence of mitigating circumstances and the assessment whether aggravating circumstances outweigh mitigating circumstances."

B. Stevenson, *The Ultimate Authority on the Ultimate Punishment: The Requisite Role of the Jury in Capital Sentencing*, 54 Ala. L.Rev. 1091, 1121 (2003) (emphasis added) (footnote omitted) (hereinafter Stevenson). *See also id.* at 1129 n. 214 (recognizing that balancing of aggravating against mitigating factors is a factual finding).

Noting the tripartite nature of the Arizona death penalty statute, Professor Stevenson argues that the *Ring* reasoning as to the first determination, the finding of an aggravating factor, applies equally to the other two determinations. He reasons as follows:

"All of the features of the aggravation finding that the *Ring* Court regarded as significant are equally true of the two other components of the tripartite sentencing determination. Arizona law conditions a death sentence upon not just a finding of an aggravating circumstance, but also a determination—after identification of any mitigating circumstances in the case—of whether the ' "mitigating circumstances [are] sufficiently substantial to call for leniency." ' Thus, as the *Ring* Court itself remarked, a defendant cannot 'be sentenced to death [under Arizona law] . . . unless [these] further findings [are] made.' Indeed, the statutory feature that the *Ring* Court deemed essential to rejecting the state's characterization of Arizona law as treating a conviction of first-degree murder as sufficient authorization for a death sentence—that the first-degree murder statute itself cross-referenced the aggravation finding as a necessary additional predicate for a sentence of death—applies equally to the other two findings. The statutory cross-reference is not merely to the provision governing the finding of aggravating circumstances: It references the entire tripartite structure for determining the existence of aggravating and mitigating circumstances and gauging their relative weight."

*Id.* at 1126–27 (footnotes omitted). Inasmuch as the Maryland statute requires that the aggravators outweigh the mitigators as an essential predicate for imposition of the death penalty, the central reasoning of *Ring* should apply.

Other states have concluded that *Ring/Apprendi* applies to the balancing process in death cases and, as a result, have held that due process requires that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Recently, the Colorado Supreme Court recognized that a balancing of aggravating factors and mitigating factors can go to a defendant's eligibility for the death penalty. In *Woldt v. People*, 64 P.3d 256 (Colo.2003), following *Ring*, the Colorado Supreme Court concluded that the Colorado death penalty statute, like the Arizona statute, improperly assigned a factfinding role to a judge in violation of the Sixth Amendment. Noting that "[i]n a weighing state, the trier of fact must weigh the aggravating factors against all the mitigating evidence to determine if the defendant is eligible for death ... A standard of beyond a reasonable doubt applies to eligibility fact-finding." *Id.* at 263. The Colorado statute has four steps, with the third step the weighing one. The court noted that "[t]hrough the first three steps, Colorado's process resembles a weighing state. 'The eligibility phase continues through step three, when the jury weighs mitigating evidence against statutory aggravators.' " *Id.* at 264 (citation omitted). The fourth step, determining whether under all the circumstances, death should be imposed, is the selection stage. The court held that "[b]ecause the Sixth Amendment requires that a jury find any facts necessary to make a defendant eligible for the death penalty, and the first three steps of [the statute], required judges to make findings of fact that render a defendant eligible for death, the statute under which Woldt and Martinez received their death sentences is unconstitutional on its face." *Id.* at 266–67. The court found the balancing stage to be a factfinding stage, required to be determined by a jury and beyond a reasonable doubt as required under *Ring*. *Id.* at 265.

In Maryland, the weighing stage includes elements of eligibility and selection. In that single stage, in concluding that aggravators outweigh mitigators, the jury is both weighing the factors and also determining whether death is appropriate.

Missouri considered the question of whether the principles set out in *Ring* invalidated a death sentence when a judge made the factual determinations on which eligibility for the death sentence was predicated in *State v. Whitfield*, 107 S.W.3d 253 (Mo.2003). Step three of the Missouri statute requires the jury to determine whether the evidence in mitigation outweighs the evidence in aggravation. *Id.* at 259. Like the Maryland statute, "[i]f it does, the defendant is not eligible for death, and the jury must return a sentence of life imprisonment. While the State once more argues that this merely calls for the jury to offer its subjective and discretionary opinion rather than to make a factual finding, this Court again disagrees." *Id.* The court held that steps one, two, and three (similar to the Maryland steps) "require factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible." *Id.* at 261.[5] The Missouri Supreme Court rejected the state's argument that the finding merely required a subjective finding by the trier of fact, noting as follows:

"But, the State fails to note that this Court rejected this very argument in its opinion on Mr. Whitfield's appeal of his initial conviction, in which it remanded for the new trial at issue here. In that decision, this Court held that step 2 requires a 'finding of fact by the jury, not a discretionary decision.' *Whitfield*, 837 S.W.2d at 515. This holding is supported by the plain language of the statute. In order to fulfill its duty, the trier of fact is required to make a case-

---

5. In Missouri, step four of the statute requires the jury to assess and declare the punishment at life imprisonment if it decides under all of the circumstances not to assess and declare the punishment at death. Step four in Missouri gives the jury the discretion to give a life sentence. Under the Maryland statute, the Missouri steps three and four are collapsed into one step—step three. Thus, step three in Maryland is a factual finding.

by-case factual determination based on all the aggravating facts the trier of fact finds are present in the case. This is necessarily a determination to be made on the facts of each case. Accordingly, under *Ring*, it is not permissible for a judge to make this factual determination. The jury is required to determine whether the statutory and other aggravators shown by the evidence warrants the imposition of death."

*Id.* at 259 (emphasis omitted).

Similarly, the Nevada Supreme Court, in *Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002), held that the weighing of aggravating against mitigating circumstances is in part a factual determination falling within the *Ring* rubric. The court stated:

"Moreover, Nevada statutory law requires two distinct findings to render a defendant death-eligible: 'The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance *and further finds* that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.' This second finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that *it is in part a factual determination, not merely discretionary weighing.* So even though *Ring* expressly abstained from ruling on any 'Sixth Amendment claim with respect to mitigating circumstances,' we conclude that *Ring* requires a jury to make this finding as well: 'If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.' "

*Id.* at 460 (second emphasis added) (footnotes omitted).

Wyoming, a weighing state like Maryland, recently addressed the burden of persuasion on the process of weighing aggravating factors against mitigating factors under the state's death penalty statute. *See Olsen v. State*, 67 P.3d 536 (Wyo.2003). The Wyoming statute does not assign a specific

burden in directing the jury to "consider aggravating and mitigating circumstances." *Id.* at 587. Nonetheless, the court directed that the jury should be instructed that before the sentence may be death, each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of a life sentence." *Id.* at 588. The court went on to state that the burden of proof in a capital case necessary for a sentence of death remains on the state, and that if the jury is to be instructed to "weigh," the defendant must produce evidence of mitigating circumstances. *Id.* at 589. The court concluded that, "just as with affirmative defenses, the ultimate burden of negating such defenses by proof beyond a reasonable doubt remains with the State." *Id.* at 589 n. 12. *See also State v. Rizzo,* 266 Conn. 171, 833 A.2d 363, 407 (2003) (noting that "Imposing the reasonable doubt standard on the weighing process, moreover, fulfills all of the functions of burdens of persuasion. By instructing the jury that its level of certitude in arriving at the outcome of the weighing process must meet the demanding standard of beyond a reasonable doubt, we minimize the risk of error, and we communicate both to the jury and to society at large the importance that we place on the awesome decision of whether a convicted capital felon shall live or die.").

Finally, the Supreme Court of Arizona, in *State v. Ring,* 204 Ariz. 534, 65 P.3d 915 (2003), on remand from the Supreme Court, rejected the state's argument that the Arizona death penalty statute requiring a judge to weigh aggravating against mitigating circumstances did not require a factual determination. The Arizona court, in concluding that *Ring* required that finding to be made by a jury, necessarily concluded that the determination was a factual one. *Id.* at 942–43.

In *Oken,* the majority maintained that "*Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors." 378 Md. at 208, 835 A.2d at 1122. It is correct that the *Ring* Court did not address specifically the issue of whether, in weighing the aggravators against the mitigators, *Apprendi* applies or

whether the jury must be convinced beyond a reasonable doubt before death may be imposed. The Court did not do so, however, most likely because Ring did not argue anything with respect to mitigators or balancing. Ring presented a "tightly delineated" claim, *Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4, 153 L.Ed.2d at 569 n. 4, raising *only* the question of whether a trial judge, sitting alone, could determine the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.[6] *Ring,* 536 U.S. at 588, 122 S.Ct. at 2432, 153 L.Ed.2d at 563. Ring argued that the Arizona death penalty statute violated the Sixth and Fourteenth Amendments because it entrusted to a judge the finding of a fact raising the defendant's maximum penalty from life to death. *Id.* at 595, 122 S.Ct. at 2436, 153 L.Ed.2d at 568. Nonetheless, *Ring* set out the general principles that courts must apply in deciding what issues may be decided by a judge and those for which a defendant is entitled to a jury determination, as well as the applicability of the higher reasonable doubt standard at least as to the finding of aggravators. Moreover, as noted earlier, on remand, the Arizona Supreme Court rejected the contention that the requirement that mitigating circumstances be considered and weighed against aggravators was not a factual predicate for

---

**6.** Footnote 4 in *Ring v. Arizona,* 536 U.S. 584, 597–98, 122 S.Ct. 2428, 2437, 153 L.Ed.2d 556, 569, makes clear that the weighing process was not before the Court. The Court stated:

"Ring's claim is tightly delineated: He contends *only* that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez–Torres v. United States,*[ 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) ] which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. Finally, Ring does not contend that his indictment was constitutionally defective." *Id.* (citations omitted) (emphasis added).

imposition of the death penalty. *See State v. Ring*, 65 P.3d at 942–43.

The *Oken* majority's thesis rested upon the view that due process only requires the finding of aggravating circumstances beyond a reasonable doubt, and not the process of weighing aggravating against mitigating factors. *See Oken*, 378 Md. at 208, 835 A.2d at 1122 (stating that "*Ring* only implicates the finding of aggravating circumstances, and not the process of weighing aggravating against mitigating factors"). It was the majority's view that the Supreme Court death penalty jurisprudence requiring the reasonable doubt standard applies only to the part of the sentencing process that makes a defendant death-eligible, as opposed to those elements involved in selecting those death-eligible defendants who will be actually sentenced to death. *Id.* at 208–10, 835 A.2d at 1122–23. The majority concluded that the selection process, that which determines whether in the judgment of the jury, the death penalty should be applied, may constitutionally be determined based on the preponderance of the evidence. *See id.*

The *Oken* majority's sole focus was upon the eligibility phase of the sentencing process, concluding that "the [Supreme] Court's Eighth Amendment jurisprudence and its holding in *Ring* make clear, it is the finding of an aggravating circumstance, and only the finding of an aggravating circumstance, which makes a defendant death-eligible." *Id.* at 256, 835 A.2d at 1150. The *Oken* majority recognized that "states must specify aggravating factors in order to direct and limit the sentencing authority's discretion as to the class of convicted defendants to which the death penalty may apply." *Id.* at 219, 835 A.2d at 1128.

The Supreme Court's discussion of eligibility versus selection arose in the context of the Court's requirement that a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty. The Supreme Court has stated that the cruel and unusual prohibition of the Eighth Amendment prohibits a state from imposing the death penalty in an arbitrary and capricious manner. Accordingly, the

sentencing authority must be provided with standards which will genuinely narrow the class of crimes and the persons against whom the death penalty is imposed by allowing it to make an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. 862, 878–80, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 250–51 (1983); *Gregg v. Georgia,* 428 U.S. 153, 206–07, 96 S.Ct. 2909, 2940–41, 49 L.Ed.2d 859, 893 (1976); *Furman v. Georgia,* 408 U.S. 238, 293–94, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346, 380–81 (1972) (Brennan, J., concurring).

The *Oken* majority ignored several important considerations. First, the majority underestimated the impact and reach of *Ring.* It has been said of *Ring v. Arizona* that it is "clearly the most significant death penalty decision of the U.S. Supreme Court since the decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), invalidating the death penalty schemes of virtually all states." *Bottoson v. Moore,* 833 So.2d 693 (Fla.2002) (Anstead, C.J., concurring). *Ring* has been called a "monumental decision that will have extensive implications across the country." Note, The Death Penalty and the Sixth Amendment: How Will the System Look After *Ring v. Arizona?,* 77 St. John's L.Rev. 371, 399 (2003). *Ring* discusses the death penalty for the first time within the framework of the Sixth Amendment. It has been suggested that the Supreme Court's overruling of *Walton* raises questions about the viability of earlier capital cases. *See* Stevenson, *supra,* at 1111, 1122 (noting that "A central difficulty in resolving these second-stage issues is that the jurisprudential tools that one would naturally use to analyze the questions—the Supreme Court's prior decisions on the jury's role in capital sentencing—are now inherently suspect in light of *Ring.*").

But even if the "eligibility" versus "selection" distinction holds in the context of the weighing process, the language and structure of the Maryland statute put the weighing process on the eligibility side rather than the selection side. I reiterate my analysis in *Borchardt:*

"Under § 412(b), a defendant is not 'death-eligible' merely by having been found guilty of first degree murder. Rather, at the conclusion of the guilt/innocence phase and a finding of guilty of first degree murder, the defendant is eligible only for a sentence of life imprisonment. The defendant cannot receive a sentence of death unless the additional requirements of § 413 have been met, *i.e.,* that at least one aggravating factor has been proven, that the defendant is a principal in the first degree, and that the aggravating circumstance[s] outweigh any mitigating circumstances. *See* § 413(h). Just as the presence of the hate crime enhancement in *Apprendi* transformed a second degree offense into a first degree offense under the New Jersey hate crime statute, the finding that the aggravating circumstances outweigh the mitigating circumstances transforms a life sentence into a death sentence under the Maryland death penalty statute."

367 Md. at 154–55, 786 A.2d at 668–69.

In addition to affronting the guarantee of federal due process, Maryland's death penalty scheme violates Article 24 of the Maryland Declaration of Rights and the basic principles of fundamental fairness guaranteed by the State Constitution. Article 24 of the Maryland Declaration of Rights provides, in pertinent part, "That no man ought to be . . . deprived of his life, liberty or property, but . . . by the Law of the land." Long before *Apprendi,* Maryland law recognized that any fact relating to the circumstance of an offense that exposed a defendant to enhanced punishment had to be determined by the trier of fact beyond a reasonable doubt. *See, e.g., Fisher & Utley v. State,* 367 Md. 218, 280–82, 786 A.2d 706, 743–44 (2001) (holding that imposition of enhanced penalty under child abuse statute where abuse causes the death must be alleged and proven beyond a reasonable doubt); *Wadlow v. State,* 335 Md. 122, 132, 642 A.2d 213, 218 (1994) (holding that when the State seeks enhanced penalties, provided by statute, for possession of cocaine with intent to distribute, the State must allege the necessary fact concerning the amount of controlled dangerous substance, and prove that fact beyond a

reasonable doubt); *Jones v. State*, 324 Md. 32, 37, 595 A.2d 463, 465 (1991) (holding that for imposition of enhanced penalty provided for by Legislature, the State must prove all statutory conditions precedent beyond a reasonable doubt).

Permitting a jury to sentence a person to death based on a preponderance of the evidence standard, *i.e.*, that death is more appropriate than not, offends Maryland due process and principles of fundamental fairness. *Cf. State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130, 151, 156 (1987); *State v. Wood*, 648 P.2d 71, 80–81 (Utah 1981).

The allocation of a particular burden of proof reflects the gravity of the task before the factfinder, the relative importance of the decision, and "a fundamental value determination of our society[.]" *In re Winship*, 397 U.S. at 372, 90 S.Ct. at 1077, 25 L.Ed.2d at 380 (Harlan, J., concurring). In *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), Chief Justice Burger expressed for the Court the significance of the highest level of requisite proof as follows:

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship, supra."*

*Id.* at 423–24, 99 S.Ct. at 1808, 60 L.Ed.2d at 329 (footnote omitted). The more serious the risk of error, the higher the requisite standard of proof.

Included within step three of the Maryland statute, the weighing provision, is the ultimate decision that death is the appropriate sentence. The reasonable doubt standard communicates to the jury the degree of certainty it must possess before arriving at the ultimate decision that death is the proper sentence. *See State v. Rizzo,* 266 Conn. 171, 833 A.2d 363 (2003);[7] *People v. Tenneson,* 788 P.2d 786, 795 (Colo. 1990).

---

**7.** In *State v. Rizzo,* 266 Conn. 171, 833 A.2d 363, 408–09 n. 37 (2003), the Connecticut Supreme Court rejected the dissent's argument that the jury's determination in the weighing process is a moral judgment, inconsistent with a reasonable doubt standard. The court reasoned as follows:

"We disagree with the dissent of Sullivan, C. J., suggesting that, because the jury's determination is a moral judgment, it is somehow inconsistent to assign a burden of persuasion to that determination. The dissent's contention relies on its understanding of the reasonable doubt standard as a quantitative evaluation of the evidence. We have already explained in this opinion that the traditional meaning of the reasonable doubt standard focuses, not on a quantification of the evidence, but on the degree of certainty of the fact finder or, in this case, the sentencer. Therefore, the nature of the jury's determination as a moral judgment does not render the application of the reasonable doubt standard to that determination inconsistent or confusing. On the contrary, it makes sense, and, indeed, is quite common, when making a moral determination, to assign a degree of certainty to that judgment. Put another way, the notion of a particular level of certainty is not inconsistent with the process of arriving at a moral judgment; our conclusion simply assigns the law's most demanding

We pay mere lip service to the principle that death is different and yet continue to impose a lower level of certainty in the death penalty context than we do for other lesser important interests in Maryland. Maryland has required a higher burden of persuasion than preponderance of the evidence in situations involving penalties far less severe than the ultimate penalty at stake under § 413. *See, e.g., 1986 Mercedes v. State,* 334 Md. 264, 282–83, 638 A.2d 1164, 1173 (1994) (requiring the state to prove the requisite elements under drug forfeiture laws by clear and convincing evidence); *Mack v. Mack,* 329 Md. 188, 207, 618 A.2d 744, 753 (1993) (requiring clear and convincing evidence for the withdrawal of life-sustaining medical treatment); *Owens–Illinois v. Zenobia,* 325 Md. 420, 469, 601 A.2d 633, 657 (1992) (requiring the clear and convincing evidence standard for proof of punitive damages); *Washington County Dep't of Soc. Serv. v. Clark,* 296 Md. 190, 197, 461 A.2d 1077, 1081 (1983) (requiring proof of parental unfitness by clear and convincing evidence in order to terminate parental rights); *Coard v. State,* 288 Md. 523, 525, 419 A.2d 383, 384 (1980) (requiring proof by clear and convincing evidence in civil commitment proceedings); *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980) (requiring the heightened evidentiary standard of clear and convincing evidence for libel and slander). *Cf. Summerlin v. Stewart,* 341 F.3d 1082, 1123 (9th Cir.2003) (stating that "We do not execute people according to ordinary legal principles that may be good enough for our more routine decisions. When the state assumes the role of the Deity, it must exercise greater care."); *see also Addington,* 441 U.S. at 425, 99 S.Ct. at 1809, 60 L.Ed.2d at 330 (stating that "[i]n cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.' ").

It is correct that states must *narrow* the class of persons deemed to be death-eligible, in order to eliminate total arbi-

---

level of certainty to the jury's most demanding and irrevocable moral judgment."

trariness and capriciousness in the imposition of the death penalty. But reliability is equally as important. Even assuming *arguendo* that the weighing portion of Maryland's death penalty scheme is purely a matter of selection, which I do not accept, I would nonetheless hold that a finding that aggravating factors outweigh mitigating factors should be determined beyond a reasonable doubt. A jury engaging in the relative comparison of aggravating factors to mitigating factors is making the final determination of whether to grant mercy and spare a defendant's life. It seems entirely incongruous that we should require the highest standards of proof when a jury decides whether a defendant is "eligible" to be executed, yet lower the bar when the jury decides whether or not the defendant is "eligible" to be spared. These life and death decisions are two sides of the same coin and they should be subject to the same level of proof.

Requiring a finding "beyond a reasonable doubt" that a defendant should be given a death sentence is in line entirely with the procedural safeguards of Maryland's death penalty scheme. A death penalty sentencing phase differs markedly from a typical sentencing in Maryland. In Maryland, a jury may impose a sentence *only* in a death penalty proceeding. In all other cases, a judge imposes the sentence. In the capital case sentencing phase, evidence is presented, a jury must pass judgment on this evidence, and the rules of evidence, although somewhat relaxed, are in force.[8] If the State must prove, beyond a reasonable doubt, every element of a crime, why should it not need to prove every element of a capital murder proceeding in the punishment phase?

Reflected throughout the Supreme Court jurisprudence underlying the Eighth Amendment is the principle that death is different. *See, e.g., Ring,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556; *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335, 347 (1986) (plurality opinion) (noting that "This especial concern [for reliability in capital

---

8. A question arises as to whether *Ring* requires strict rules of evidence during the entire post-conviction part of a death penalty trial.

proceedings] is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 401 (1977) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976) (plurality opinion); *Furman,* 408 U.S. at 289, 92 S.Ct. at 2752, 33 L.Ed.2d at 378 (Brennan, J., concurring). In a death proceeding, the Supreme Court has recognized that "the Eighth Amendment requires a greater degree of accuracy and fact-finding than would be true in a noncapital case." *Gilmore v. Taylor,* 508 U.S. 333, 342, 113 S.Ct. 2112, 2117, 124 L.Ed.2d 306, 318 (1993). Justice Kennedy has observed that "all of our Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense." *Sawyer v. Smith,* 497 U.S. 227, 243, 110 S.Ct. 2822, 2832, 111 L.Ed.2d 193, 212 (1990).

*Ring* dealt with the Sixth Amendment right to a jury trial. Not to be overlooked, however, is the right to a fair and *reliable* sentencing determination. Throughout the jurisprudence on the death penalty is the universal recognition that death is different. *See Zant,* 462 U.S. at 884–85, 103 S.Ct. at 2747, 77 L.Ed.2d at 255 (noting that "because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' ") (quoting *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991, 49 L.Ed.2d at 961); *Gardner,* 430 U.S. at 357, 97 S.Ct. at 1204, 51 L.Ed.2d at 401. Because the death penalty is qualitatively different from a prison sentence, the Supreme Court, and our Court, requires that the death penalty may not be imposed unless the jury makes an individualized determination that death is the appropriate sentence for the particular defendant. *Woodson,* 428 U.S. at 303–04, 96 S.Ct. at 2991, 49 L.Ed.2d at 960–61. In *Furman,* 408 U.S. at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388 (Stewart, J., concurring), Justice Stewart stated:

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."

Because death is fundamentally different, heightened reliability is required at all stages of a death penalty trial. That includes the guilt/innocence phase, and the *entire* sentencing process. In discussing the unique nature of capital punishment, Justice Stevens in dissent noted in *Murray v. Giarratano*, 492 U.S. 1, 22 n. 9, 109 S.Ct. 2765, 2777 n. 9, 106 L.Ed.2d 1, 19 n. 9 (1989), as follows:

"In 1983, 11 years after *Furman* had been decided, Justice O'Connor observed in a majority opinion that the 'Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' *California v. Ramos*, 463 U.S. 992, 998–999, 103 S.Ct. 3446, 77 L.Ed.2d 1171 [1983]; *see id.*, at 999, n. 9, 103 S.Ct. 3446 (citing cases). *See also, e.g., Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Marshall, J., plurality opinion) ('In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different'); *Ake v. Oklahoma*, 470 U.S. 68, 87, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (Burger, C.J., concurring in judgment) ('In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases'); *Gardner v. Florida*, 430 U.S. 349, 357–358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (Stevens, J., plurality opinion) ('From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its

citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion')."

In sum, the touchstone of *Apprendi*, applied to capital cases in *Ring*, is to decide whether a requisite finding exposes the defendant to a higher sentence than can be imposed solely on the basis of a criminal conviction. As the *Ring* Court stated, "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439, 153 L.Ed.2d at 572. Because in Maryland the finding that aggravating factors outweigh mitigating factors is a necessary predicate for the imposition of the death penalty, *Apprendi* and *Ring* require that this finding be made, by a jury, and not by a preponderance of the evidence, but beyond a reasonable doubt.

Chief Judge BELL and Judge ELDRIDGE authorize me to state that they join in Part II of this dissenting opinion.

Dissenting Opinion by BATTAGLIA, J. which BELL, C.J., and ELDRIDGE, J., join.

I would reverse the convictions and death sentence of John Albert Miller, IV, and remand this case for a new trial. A jury in the Circuit Court for Allegany County found Miller guilty of first-degree premeditated murder, first-degree sexual assault, robbery, and false imprisonment. Based on its findings at the sentencing proceeding, the jury determined Miller's sentence to be death.[1] Among the numerous challenges

---

1. Effective October 1, 2002, the statutory provisions governing homicide and sentencing procedures had been revised without substantive change. Maryland Code, Article 27 § 413 (1957, 1996 Rep. Vol.), which governed the sentencing procedures at the time of Miller's trial, is now codified under Maryland Code, § 2–202, § 2–303, § 2–304, § 2–305 of the Criminal Law Article (2002). Section 413 stated in relevant part:

Note 1—Continued

(a) *Separate sentencing proceeding required.*—If a person is found guilty of murder in the first degree, and if the State had given the notice required under § 412(b), a separate sentencing proceeding shall be conducted as soon as practicable after the trial has been completed to determine whether he shall be sentenced to death.

(b) *Before whom proceeding conducted.*—This proceeding shall be conducted:

(1) Before the jury that determined the defendant's guilt; or

(2) Before a jury impaneled for the purpose of the proceeding if:

(i) The defendant was convicted upon a plea of guilty;

(ii) The defendant was convicted after a trial before the court sitting without a jury;

(iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or

(iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant.

\* \* \*

(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

(1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

(2) The defendant committed the murder at a time when he was confined in any correctional institution;

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer;

(4) The victim was taken or attempted to be taken in the course of a kidnaping or abduction or an attempt to kidnap or abduct;

(5) The victim was a child abducted in violation of § 2 of this article;

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder;

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration;

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life;

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident; or

(10) The defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree.

\* \* \*

(f) *Finding that no aggravating circumstances exist.*—If the court or jury does not find, beyond a reasonable doubt, that one or more of

to his conviction and sentence, Miller complains that newly discovered evidence warrants a new trial. I agree with Miller that a new trial is required because there is a substantial or significant possibility that the newly discovered evidence would have produced a different result in this case.

---

Note 1—Continued

these aggravating circumstances exist, it shall state that conclusion in writing, and a sentence of death may not be imposed.

(g) *Consideration of mitigating circumstances.*—If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence. As used in this paragraph, "crime of violence" means abduction, arson in the first degree, escape in the first degree, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, carjacking or armed carjacking, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.

(h) *Weighing aggravating and mitigating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.

(2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.

(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed.

## I.  Background

## A.  Miller's Trial

Miller's convictions arose from the murder of Shen Poehl-man on July 28, 1998.  Miller's jury trial in the Circuit Court for Allegany County commenced on January 31, 2000, and continued until February 3, 2000.[2]  The State presented evidence to support the theory that Poehlman had been murdered while Miller was committing or attempting to commit a first degree sexual offense.  Among this evidence was testimony of Detective Carroll Bollinger, who had observed the scene where Poehlman's body had been found.  He testified about the condition of the body before it was released to the medical examiner.  Detective Bollinger noticed a ligature mark on the neck, cuts and bruising on the knees, and that an unfastened bra, shorts, socks, and tennis shoes remained on the body.

The medical examiner testified to his observation of a ligature mark on the neck as well as bruising on the body and blunt force injuries to the victim's head.  The autopsy results indicated that the cause of death was ligature strangulation and the manner of death was homicide.  Although tests of the body failed to identify the presence of semen, there was a semen stain on Poehlman's blouse that matched Miller's DNA.

In addition, the State presented evidence of numerous statements made by Miller after he had been arrested and while the police processed the case.  He had given a lengthy written statement that described his sexual encounter with Poehlman as consensual.  According to this statement, Miller began strangling Poehlman in a panic after the sexual encounter concluded because he was afraid his girlfriend would learn of the episode with Poehlman.  His plan at the time, as described in the statement, involved causing Poehlman to "pass out," so she would "see that [he was] an ass" and not "bother" with him any longer.  Miller insisted in his statement that Poehl-

---

2.  Miller was charged in Baltimore County, but his case was transferred to the Circuit Court for Garrett County and subsequently to the Circuit Court for Allegany County.

man, although unconscious, continued to breathe when he put her in the car, drove her to where she was eventually found, and left her. Miller's other statements depicted the crime similarly, and not once did he admit to choking or strangling Poehlman during the course of the sexual encounter.

To support its theory that Poehlman's homicide took place during a sexual offense, the State presented information that had been obtained from Clarence Bobbitt, a former cell mate who claimed that he had spoken to Miller while Miller was awaiting trial. To this end, the State called two officers, Detectives Hill and Fox, to testify about interviews conducted with Clarence Bobbitt and a written statement that he had provided. Testifying first was Detective Hill, who stated that Bobbitt had written his statement willingly even though he could not read or write "very well." Detective Hill also stated that he had offered nothing to Bobbitt for his statement and did not make "any kind of a plea agreement with him regarding whatever other charges he had."

Detective Fox testified that, on February 16, 1999, he had picked up Bobbitt from the Sheriff's Department and took him to the White Marsh Precinct. While Detective Fox was interviewing Bobbitt as part of routine processing, Bobbitt told the detective that he had information about a number of crimes including the murder of Shen Poehlman. Bobbitt told Detective Fox information about the murder that "only someone [who] had detailed information could provide." When the detective then asked for a written statement, Bobbitt first asked what was in it for him. The detective testified that he replied, "Absolutely nothing." Instead, he told Bobbitt that he should provide the statement "because it would be the right thing to do," and it might "clear [his] conscience." The detective also testified that he did not promise anything to Bobbitt or threaten him.

Bobbitt, who was 19 years old at the time of trial and still incarcerated, testified about what he had learned from Miller while the two shared a cell. During his testimony, Bobbitt explained that he currently was awaiting sentencing for a

guilty plea that he already had entered. He testified, however, that he had not made any plea agreements in exchange for his testimony in the Miller case and had not told even his lawyer about the conversations he had had with the police about the Poehlman murder. Bobbitt then recounted the events of the murder, which, according to his testimony, he had learned from Miller:

On that night, he said he was walking aside of a school. He seen a girl. He asked her if she wanted to babysit. She said yeah. So he gave her a ... he gave her his phone number, got his phone number. And then he went home. The next night he called her. She come.... Asked her if she wanted to come over and babysit for him. He said she said yes. She come over and they ... She knocked on the door. He opened it. She asked him where the kids were. He said they ain't here right now. And then she come in. And he tried to seduce her. She said no. Threw her on the bed. He smacked her, ripped her top off, started sexually assaulting her. And then he strangled her with his hand. And he put a bag over her face. And then he put a chastity belt on her face ... I mean around her neck, and stepped on one-half and pulled on the other half of it. And realized what he had done. And then he went and took her down, wrapped in a blanket, took her downstairs, put her in the backseat of her car, drove like two blocks and parked the car, took the keys and her money out of her pocket ... I mean took the money out of her pocket and put it in her back pocket, put it in his pocket. Took everything else, chastity belt, her shirt, cause he had got semen on it and threw all that in a trash can.

Bobbitt went on to discuss written answers that he had given to questions posed by Detective Fox when he first had discussed Miller's case with police. These written answers described further details of the crime, suggesting that Miller was engaging in a sexual act and had ejaculated while choking Poehlman.

On cross examination, one of the defense lawyers questioned Bobbitt extensively about his background, his interaction with

Miller, his statement, and the police interrogation. In response, Bobbitt described himself as a drug dealer and spoke about his criminal past and illegal drug abuse. Bobbitt, however, denied expecting anything in return for the information he provided police. He stated, "If I was expecting something out of this, I would have told my lawyer. I would have had my lawyer present when I was giving my statement. I would have told the State's Attorney on my case what I was doing. I would have told the Judge what I was doing." He also testified that, in his pending sentencing proceeding, he was not expecting "the Judge to go easier" on him in return for his testimony.

At the conclusion of the evidence on February 3, 2000, the trial judge granted Miller's motion for judgment of acquittal on the charge of attempted rape. The jury convicted Miller of the other charges: premeditated murder, first degree sexual offense, robbery, and false imprisonment. At the sentencing phase of Miller's case, which took place from February 7–9, 2000, the jury found that Miller was a principal in the first degree and, as an aggravating circumstance, that Miller had committed the crime while committing or attempting to commit a first-degree sex offense. As mitigating circumstances, the jury found "family environment" and that Miller had no prior record of committing a crime of violence. Finding further that the aggravating circumstances outweighed the mitigating circumstances in the case, the jury determined Miller's sentence to be death. In accordance with the jury's determination, the trial judge signed and filed a warrant of execution.

### C. The Joswick Trial

In a separate and unrelated trial on February 6, 2002, two years after Miller's trial, Bobbitt again was called as a State's witness. In the criminal trial against his uncle, Richard Lance Joswick, Bobbitt testified about the murder of Melissa Taylor. During cross examination, defense counsel brought up the issue of Bobbitt's previous testimony in Miller's case. He asked, "This is not the first time you testified, is it, Mr.

Bobbitt?" After Bobbitt answered, "No," the prosecutor objected. The lawyers then approached the bench, where defense counsel suggested that Bobbitt had been given leniency for his previous testimony in a murder case. Defense counsel informed the judge that he wanted to explore whether Bobbitt was currently testifying with an expectation of receiving some benefit. The prosecutor withdrew the objection and cross-examination continued with regard to his previous testimony in a death penalty case. Bobbitt, however, denied receiving or expecting any benefit for testifying in that case or in Joswick's.

On redirect, the prosecutor revisited the issue of Bobbitt's testimony in Miller's case. The following colloquy ensued:

Q. Just so I'm clear, Mr. Bobbitt, you testified in a matter completely unrelated to this case against a John Miller, is that right?

A. Yes, sir.

Q. Did you have a plea agreement in that case?

A. Yeah.

Q. Where you entered into a negotiation with the State?

A. Like a plea with the State?

Q. Yes.

A. Yeah, we pled for a sentence.

Q. Exactly. And you had entered into a bargain; is that right?

A. Yes, sir.

Q. In exchange for that bargain, you gave certain testimony in that case; is that right?

A. Yes, sir?

Q. Did anything like that take place in this case?

A. No, sir.

Based on this evidence that Bobbitt may have been induced to testify in 2000, Miller filed a motion for a new trial on

March 15, 2002.[3]   On August 1, 2002, the Circuit Court for Allegany County held a hearing on that motion, during which Miller argued that Bobbitt's contradictory testimony constituted newly discovered evidence that was relevant to the jury's verdict with respect to its finding of guilt and sentence determination.   Miller contended, therefore, that he was entitled not only to a new sentencing proceeding, but also a new trial.

As additional support for his assertion that Bobbitt may have been given a benefit to testify against him, Miller presented evidence of the criminal proceedings against Bobbitt. When Bobbitt, before his testimony in the Miller case, came before the Circuit Court for Baltimore County on September 7, 1999, to plead guilty to first degree burglary and unauthorized use of a motor vehicle, the victim expressed concern that the plea agreement was too lenient.   In response, the judge stated, "[H]e will go to jail for at least five years probably consecutive to what he is serving now."   When Bobbitt was eventually sentenced for the crimes on April 6, 2001, after his testimony in the Miller case, the judge imposed a ten-year prison sentence, all of which was suspended.

The State presented two witnesses, Mickey J. Norman, Esq., and Stephen Bailey, Esq., both prosecutors with the Baltimore County State's Attorney's Office.   Norman, one of the prosecutors in Miller's case, testified that he "never made Mr. Bobbitt any promises . . . for testifying in any case" and had not done anything to benefit Bobbitt.   He also stated that he did not ask Judge Fader to do anything for Bobbitt and denied "direct[ing] anyone else in the Baltimore County State's Attorney's Office or Police Department" to make "promises" to Bobbitt or "to benefit [him] in any way." Bailey, the lead prosecutor in the Joswick case, maintained that he never offered Bobbitt anything for his testimony in either the Miller or Joswick case.   Bailey then explained that he questioned Bobbitt about the Miller case on redirect in the

---

3.   By order dated February 20, 2002, this Court held Miller's appeal in abeyance to permit Miller to litigate the motion for a new trial before the Circuit Court.

Joswick trial only because he, himself, was unsure whether Bobbitt had made a deal for the testimony in Miller. Afraid that Bobbitt, in fact, did have a deal in the Miller case, Bailey intended to clarify the issue to prevent Bobbitt's credibility from being attacked by the defense. Bailey contended that the transcript of his redirect of Bobbitt was somewhat misleading:

Q. And when you asked [Bobbitt] whether he had a plea agreement with the State in [the Miller] case, doesn't he then go on to say that he pled for a sentence?

A. It does, and in fact, the transcript, on page forty, where it says where you entered into a negotiation with the State, that is my question. And his answer, like a plea with the State? My question was yes. And it was actually, yes, exactly. You can see that, but we are talking over each other at that point. He says like a plea with the State? And I say yes, exactly. It is typed up as yes, we applied for a sentence, and that somehow my next question is exactly, and then a question.

Q. Okay.

A. He does indicate that he pled for a sentence.

Bailey also stated that he knew of plea agreements that Bobbitt had entered into but believed that Bobbitt's testimony in both the Miller and Joswick cases was not connected to those agreements.

The Circuit Court denied Miller's motion for a new trial, stating:

Upon the evidence presented, this Court concludes: (1) that assuming the testimony of Clarence Bobbitt presented on February 6, 2002 in the case of *State v. Joswick* (No. 01–CR–1669, Circuit Court for Baltimore County) constituted newly discovered evidence, the Defendant has not met his burden to demonstrate that there is a substantial or significant possibility that the verdict of the jury in either the guilt/innocence or the sentencing phases of this case would have been affected. . . .

On appeal to this Court,[4] Miller presents a total of 18 questions and urges the reversal of his convictions and sentence. Nonetheless, resolution of the following one issue eliminates any need to address the others:

Did the trial court err in denying Miller's motion for new trial or new sentencing hearing where Bobbitt, a key State's witness, testified at trial that he had received no inducement for his testimony and entered into no deals or plea bargains, but testified in an unrelated proceeding after Miller had been sentenced that he had testified against Miller as part of a plea bargain? [5]

---

4. Miller appealed his conviction and sentence pursuant Maryland Code, Article 27 § 414 (1957, 1996 Repl. Vol), which has been recodified at Maryland Code, § 2–401 of the Criminal Law Article (2002). Section 414 stated in part:

(a) *Review by court of Appeals required.*—Whenever the death penalty is imposed, and the judgment becomes final, the Court of Appeals shall review the sentence on the record.

(b) *Transmission of papers to Court of Appeals.*—The clerk of the trial court shall transmit to the Clerk of the Court of Appeals the entire record and transcript of the sentencing proceeding within ten days after receipt of the transcript by the trial court. The clerk also shall transmit the written findings and determination of the court or jury and a report prepared by the trial court. The report shall be in the form of a standard questionnaire prepared and supplied by the Court of Appeals of Maryland and shall include a recommendation by the trial court as to whether or not imposition of the sentence of death is justified in the case.

\* \* \*

(e) *Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d); and

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances.

5. The questions posed by Miller that need not be reached are as follows:

1. Did the trial court err in instructing the jury that proof beyond a reasonable doubt is a different and lesser standard at a capital sentencing hearing than during the guilt or innocence stage of the proceeding?

I would hold that reversal of Miller's convictions and a new trial are necessary because of newly discovered evidence that Bobbitt may have lied about whether his testimony had been induced by an agreement.

---

Note 5—Continued

2. Did the trial court err in failing to adequately instruct the jury concerning the individual weighing of mitigating circumstances found by less than all of the jurors against aggravating circumstances, and in refusing to propound the instruction on that subject requested by the defense?

3. Were statements made by the appellant in response to questioning by the police after they entered his home obtained in violation of the dictates of *Miranda v. Arizona?*

4. Did the court err in permitting improper rebuttal closing argument by the State at the sentencing hearing?

5. Is the Maryland death penalty law unconstitutional?

6. Did the warrantless search of the appellant's apartment violate the Fourth Amendment?

7. Did the trial court err in its instruction regarding the proper role of victim impact evidence, and in refusing to propound the instruction submitted by the defense?

8. Did the trial court err at the sentencing hearing, in sending to the jury the aggravating circumstance of robbery, when the evidence was insufficient to support that aggravating circumstance?

9. Was the evidence sufficient to prove, as an aggravating factor at sentencing, that the appellant murdered the victim while committing a sexual offense in the first degree?

10. Was the failure to instruct the sentencing jury regarding corroboration of the underlying felony plain error material to the rights of the accused?

11. Did the court err at the sentencing hearing, in permitting the prosecutor to impeach the defense expert with two different improper lines of questioning?

12. Was the appellant arrested with probable cause?

13. Was the evidence sufficient to sustain the appellant's conviction for a first degree sex offense?

14. [Was] the trial judge's failure to instruct the jury that the *corpus delecti* of the first degree sex offense must be corroborated by independent evidence plain error material to the appellant's rights?

15. Did the trial court err in instructing the jury that mitigating circumstances must be raised by the evidence, and in permitting the State to argue that such factors may not be "... pulled out of the air to justify an end?"

16. Did the trial court fail to make adequate findings of fact in denying Appellant's Motion for New Trial or New Sentencing Hearing?

## II.  Standard of Review

Recently, in *Campbell v. State,* 373 Md. 637, 665–66, 821 A.2d 1, 18 (2003), this Court discussed the standard for appellate review of the denial of a motion for a new trial:

> [D]enials of motions for new trials are reviewable on appeal and rulings on such motions are subject to reversal when there is an abuse of discretion. *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344, 1352 (1984); *Wernsing v. Gen. Motors Corp.,* 298 Md. 406, 420, 470 A.2d 802, 809 (1984). We have noted that the discretion afforded a trial judge "is broad but it is not boundless." *Nelson v. State,* 315 Md. 62, 70, 553 A.2d 667, 671 (1989). The abuse of discretion standard requires a trial judge to use his or her discretion soundly and the record must reflect the exercise of that discretion. Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law. *Ricks v. State,* 312 Md. 11, 31, 537 A.2d 612 (1988). As we indicated in *Buck v. Cam's Rugs,* 328 Md. 51, 612 A.2d 1294 (1992), "a trial judge has virtually no 'discretion' to refuse to consider newly discovered evidence that bears directly on the question of whether a new trial should be granted," and a new trial should be granted when newly discovered evidence clearly indicates that the jury has been misled. 328 Md. at 58–59, 612 A.2d at 1298. In the context of the denial of a motion for a new trial in a criminal case, we have noted that "under some circumstances a trial judge's discretion to deny a motion for a new trial is much more limited than under other circumstances." *Merritt v. State,* 367 Md. 17, 29, 785 A.2d 756, 764 (2001). We stated, "[I]t may be said that the breadth of a trial judge's discretion to grant or deny a new trial is not fixed or immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had

Note 5—Continued

17.  Is Maryland's death penalty law unconstitutional in light of the Supreme Court's decision in *Ring v. Arizona?*

to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice." *Wernsing,* 298 Md. at 420, 470 A.2d at 802.

## III. Discussion

Miller contends, as he did before the Circuit Court, that Bobbitt's testimony in the Joswick case amounts to newly discovered evidence about "whether his testimony was bought and paid for" and about his utter lack of credibility. He complains that, in light of this newly discovered evidence, it is evident that Bobbitt lied under oath in either the Miller case or in the Joswick case. Under Miller's view, this evidence is "highly material" because Bobbitt's testimony "provided by far the most damning version of the death of Shen Poehlman," leading the jury to convict Miller of first-degree sexual offense and to find the sole aggravating factor that formed the basis for the death sentence. According to Miller, Bobbitt's testimony was so critical to the verdict and sentence that, had the jury disbelieved it as a result of hearing the new evidence, there is a significant possibility that the result of the trial would have been different.

The State insists, however, that it never entered into a deal with Bobbitt for his testimony and that the transcript of Bobbitt's testimony during the Joswick trial, if read closely, does not provide any evidence of such a deal. The State also maintains that Bobbitt's testimony was not essential to the verdict and sentence because, even without Bobbitt's testimony, ample evidence supports the jury's finding that Miller committed a first degree sexual offense or that Poehlman was not a willing participant in the encounter. Therefore, in the State's view, there was no substantial or significant possibility that what occurred in the Joswick trial impacted Miller's case.

Initially, I should address the State's assertion that the transcript in the Joswick case does not furnish evidence of a deal for Bobbitt's testimony. The State contends that Bobbitt was confused when he testified on redirect at the Joswick trial and, as a result, gave answers that were misleading. The

State points, specifically, to Bobbitt's answer to the prosecutor's question, "In exchange for that bargain, you gave certain testimony in that case; is that right?" The court reporter transcribed Bobbitt's answer as, "Yes, sir?" According to the State, the question mark following Bobbitt's answer indicates that he was confused and did not understand the question, not that he, in fact, admitted to a deal for his testimony. Based on the prosecutor's testimony at Miller's hearing for a new trial, the State further argues that Bobbitt, who is "very uneducated," believed that he was admitting to a plea agreement that he had made in connection with a burglary charge that was independent of any testimony he gave.

A straightforward reading of the transcript belies the State's contention. The questions and answers during the prosecutor's redirect examination speak for themselves:

Q. Just so I'm clear, Mr. Bobbitt, you testified in a matter completely unrelated to this case against a John Miller, is that right?

A. Yes, sir.

Q. Did you have a plea agreement in that case?

A. Yeah.

Q. Where you entered into a negotiation with the State?

A. Like a plea with the State?

Q. Yes.

A. Yeah, we pled for a sentence.

Q. Exactly. And you had entered into a bargain; is that right?

A. Yes, sir.

Q. In exchange for that bargain, you gave certain testimony in that case; is that right?

A. Yes, sir?

Q. Did anything like that take place in this case?

A. No, sir.

I find it difficult to believe that Bobbitt, despite his limited education, was confused about the substance of his testimony, when the prosecutor referred to the Miller case specifically by

name. Furthermore, the State has presented no evidence that Bobbitt testified in any proceedings other than the Miller and Joswick cases, so it is highly unlikely that Bobbitt mistook his Miller testimony for testimony he gave in some other case.

According to Judge Wilner's opinion, all of the newly discovered evidence relied on in this case amounts to "one ambiguous response, recorded not as an *answer* but as a *question.*" Wilner op. at 27. This statement is invalid. Unlike Judge Wilner's assertion, and as the above colloquy plainly demonstrates, Bobbitt made more than a single statement suggesting that his testimony against Miller was induced by a deal for a lighter sentence. In fact, Bobbitt responded affirmatively no less than five times to questions about a plea bargain related to the Miller case. The appearance of a question mark at the end of one of those affirmative responses does not render all of the other responses unreliable or ambiguous. From the transcript, it is clear that Bobbitt knew that he was being questioned about the Miller case and responded that he considered his testimony against Miller as part of a bargain with the State.

Because Bobbitt testified in the Joswick trial that he did make a deal with the State to provide testimony against Miller, the next question becomes whether the trial court was correct in denying a new trial based on this evidence. In determining whether a new trial is warranted based on newly discovered evidence, the trial court must employ a two-pronged approach. Under this approach, the movant has the burden to demonstrate: (1) that the newly discovered evidence was, in fact, newly discovered and (2) that it "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected."; (*Yorke v. State*, 315 Md. 578, 588, 556 A.2d 230, 235 (1989)); *see also Campbell*, 373 Md. at 671–72, 821 A.2d at 21; *Baker v. State*, 367 Md. 648, 695–96, 790 A.2d 629, 657 (2002) (applying the two-pronged approach in affirming the trial court's denial of a new trial based on newly discovered evidence in a death penalty case); *Jackson v. State*,

358 Md. 612, 626, 751 A.2d 473, 480 (2000); *Argyrou v. State,* 349 Md. 587, 600–01, 709 A.2d 1194, 1200–01 (1998).

The first prong, which has been described as "essentially a factual one," is derived from Maryland Rule 4–331. *Jackson,* 358 Md. at 626, 751 A.2d at 480. Under Rule 4–331(a), the circuit court may order a new trial "in the interest of justice" if the defendant files a motion "within ten days after a verdict," and, subject to the requirements of Rule 4–331(c), may order a new trial on the basis of newly discovered evidence. Rule 4–331(c) states in part:

> (c) **Newly discovered evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
>
> (1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later;
>
> (2) on motion filed at any time if a sentence of death was imposed and the newly discovered evidence, if proven, would show that the defendant is innocent of the capital crime of which the defendant was convicted or of an aggravating circumstance or other condition of eligibility for the death penalty actually found by the court or jury in imposing the death sentence. . . .

In the present case, on March 15, 2002, Miller filed a motion for a new trial pursuant to Rule 4–331(c)(2). The evidence of Bobbitt's contradictory testimony about a deal with the State manifested at the Joswick trial in February of 2002, well over a year after Miller received the death sentence on February 9, 2000. The other evidence that Miller points to, Bobbitt's suspended sentence that he received on April 6, 2001 after testifying against Miller, also occurred well over a year after Miller's sentence was imposed. Neither of these events, therefore, possibly could have been discovered earlier by Miller with any amount of diligence. There is no doubt,

therefore, that the evidence on which Miller relies is, in fact, newly discovered.

The second and more complex prong of the analysis in this case involves a determination of the impact of the evidence, an inquiry which this Court has characterized as "a judgmental one—weighing the effect of the evidence." *Jackson*, 358 Md. at 626, 751 A.2d at 480. A new trial based on newly discovered evidence is permitted if the newly discovered evidence "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Yorke*, 315 Md. at 588, 556 A.2d at 235. The evidence further must "touch[ ] upon evidence presented at trial," *id.* at 585, 556 A.2d at 233, and "must be more than 'merely cumulative or impeaching.' " *Argyrou*, 349 Md. at 601, 709 A.2d at 1201 (citing *Love v. State*, 95 Md.App. 420, 432, 621 A.2d 910, 917 (1993); *Jones v. State*, 16 Md.App. 472, 477, 298 A.2d 483, 486 (1973)). The newly discovered evidence in the present case, although impeaching, is not cumulative because it opens, for the first time, a previously obstructed and important avenue for attacking the State's case.

In *Yorke*, this Court announced that newly discovered evidence warrants a new trial only if it "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Yorke*, 315 Md. at 588, 556 A.2d at 235. The Court applied this standard to newly discovered evidence that the DNA of the petitioner, who had been convicted of rape four years earlier, did not match the DNA found from a vaginal washing taken from the victim after the rape. Although the evidence "touched upon" the evidence presented at trial, as to the "persuasiveness" of the newly discovered DNA evidence, the opinion in *Yorke* stated:

> We cannot say, in the light of our standard, that the new evidence touched on the evidence at the trial to the extent that it "may well have produced a different result." We do not believe that there was "a substantial or significant possibility" that it would do so. As the judge recognized,

the new evidence showed no more than that the DNA pattern in the vaginal swabbings of the victim did not match Yorke's DNA pattern. The DNA test results before the court did not even disclose the origin of the DNA pattern which was found in the washings. [The victim] did not know whether the rapist had ejaculated so that the absence of Yorke's DNA pattern did not exclude him as the criminal agent. We hold that the trial judge did not abuse his discretion in denying the motion for a new trial.

*Id.* at 590, 556 A.2d at 236.

This Court recently weighed the impact of newly discovered impeachment evidence in *Campbell,* 373 Md. at 670, 821 A.2d at 20. The newly discovered evidence at issue there involved information concerning a State's witness in the underlying murder trial who allegedly "previously had accused falsely another person of murder" in an unrelated case. *Id.* at 644, 821 A.2d at 5. Campbell argued that testimony of this false accusation would have "inspired the jury to distrust [the witness's] statement" that Campbell committed the murder. *Id.* at 651–52, 821 A.2d at 9. Reasoning that the witness's credibility had been impeached thoroughly at trial, the Court concluded that Campbell's motion for a new trial had been denied appropriately. The jury had heard evidence that the witness was a hit-man and drug-dealer, that he had murdered seven people within an eighteen-month period, that he had been paid for committing those murders, that he had falsified his criminal record to get into the United States Marine Corps, and that he sought to avoid the death sentence by testifying at Campbell's trial. *Id.* at 670, 821 A.2d at 21. This Court stated, "Surely the presentation of additional evidence would reinforce the shadows cast initially on [the witness's] character and motive for testifying, but the new evidence involved a collateral matter and was cumulative to that already presented." *Id.* at 671, 821 A.2d at 21. Additionally, the *Campbell* opinion declared that there was "not a 'substantial or significant possibility' " that the "cumulative impeachment evidence" would produce a different result. *Id.* at 671–72, 821 A.2d at 21. The Court concluded that the "trial judge

'felt the pulse of the trial' and was entitled to rely on his own impressions to determine, without exceeding the limits of his discretion, that the new evidence bearing on [the witness's] trustworthiness was not substantially likely to tip the balance in favor of Campbell." *Id.* at 672, 821 A.2d at 21.

The circumstances in *Campbell* that this Court found persuasive, however, do not appear in the present case. Given the extent to which the witness in *Campbell* had been impeached at trial, the newly discovered evidence of his previous allegedly false statement was nothing more than "cumulative impeachment evidence" because it would have had little effect on the jury's credibility determination.

The same cannot be said about the newly discovered evidence at issue in the present case, however, considering the powerful impeaching effect of evidence of a witness's plea bargain with the State and the importance of Bobbitt's testimony to Miller's conviction and death sentence. Impeachment evidence, "if disclosed and used effectively, ... may make the difference between conviction and acquittal." *Conyers v. State,* 367 Md. 571, 606, 790 A.2d 15, 36 (2002) (citing *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 556 (4th Cir.1999)). In particular, "[e]vidence of agreements or deals with witnesses often provides powerful impeachment evidence against a witness and enables a defendant to attack the motive or bias of a witness who might otherwise appear to have no motive to falsify or color his testimony." *Ware v. State,* 348 Md. 19, 50, 702 A.2d 699, 714 (1997); *United States v. Werme,* 939 F.2d 108, 114 (3rd Cir.1991) ("Proof that a witness has pleaded guilty or has agreed to plead guilty is highly relevant to show bias, a recognized mode of impeachment."). Recognizing that evidence of witness cooperation with the State is potentially so impeaching, this Court has held that the jury is entitled to know, not just that an agreement exists, but also the terms of the agreement to "assess whether the 'deal' would reasonably tend to indicate that [the witness's] testimony has been influenced by bias or motive to testify falsely." *Marshall v. State,* 346 Md. 186, 197–98, 695 A.2d 184, 189–90 (1997). Consistent with the principles underlying that holding, the State is re-

quired to disclose to the defendant the specific terms of a written plea agreement with cooperating witnesses. *Wilson v. State*, 363 Md. 333, 356, 768 A.2d 675, 687 (2001); *see Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972) (holding that an individual was denied due process where the prosecution failed to disclose facts of promises made to a witness in exchange for testimony).

Because of the powerful impeaching effect of evidence of witness cooperation with the State, the newly discovered evidence of Bobbitt's possible deal with authorities casts serious doubt on the veracity of his testimony and could reduce, if not eliminate, its impact. The evidence at issue in this case differs from that in *Campbell* where the petitioner sought to impeach the witness against him by introducing newly discovered evidence of a prior alleged false accusation. Here, Miller has discovered that Bobbitt may have had a deal with authorities. Impeachment evidence of this genre is much more "powerful" than almost any other type of impeachment evidence and, therefore, surely would qualify as more than "collateral impeachment" or "peripheral contradiction."

In addition, unlike the witness in *Campbell* whose testimony had been thoroughly discredited at trial, Bobbitt's credibility had suffered little damage at trial after cross examination. The only evidence possibly impeaching Bobbitt at trial consisted of his statements about his criminal past and that he had been a drug dealer and user, and Bobbitt denied entering into any agreement with police or prosecutors in exchange for his testimony against Miller. While testifying at the Joswick trial, however, Bobbitt directly contradicted his testimony in the Miller case, stating that he had agreed to a deal for his testimony against Miller. This evidence clearly "touches on" whether Bobbitt, in fact, had a deal with the State to testify for some benefit and, thus, calls into question his purpose and motive for testifying. Whatever credit the jury gave Bobbitt's testimony may well deteriorate in light of the new impeachment evidence.

I am particularly concerned over the effect of the newly discovered impeachment evidence because Bobbitt's testimony was critical. It described the encounter between Miller and Poehlman as entirely against the victim's will, a violent attack undertaken after Poehlman refused Miller's sexual advances. Bobbitt's version of the homicide portrayed Miller strangling the victim while, at the same time, engaging in a sexual act. Had the jury discounted Bobbitt's testimony entirely, the remaining evidence may have done little to support the State's theory and jury's finding that the murder occurred in the course of a brutal sexual attack. In his numerous admissions, Miller described the sexual encounter as consensual, and he claimed that, after the sexual episode, the victim's death occurred accidentally while he panicked and attempted to subdue her. Nevertheless, the jury, having heard Bobbitt's version of the homicide, found only a single aggravating factor, that Miller had committed the crime while committing or attempting to commit a first-degree sexual offense. Absent Bobbitt's testimony, however, the record may not have contained sufficient evidence for a jury to find beyond a reasonable doubt that the homicide occurred during a first degree sexual offense. Because the jury's sentence of death and verdict regarding the first degree sexual offense rested heavily on Bobbitt's testimony, it follows necessarily that had the jury disbelieved it, there is a "substantial or significant possibility" that the result at trial and at sentencing would have been different.

Judge Wilner's opinion contends that, in light of Bobbitt's other testimony in the Miller and Joswick cases and the testimony of prosecutors that no deal for Bobbitt's cooperation ever existed, the jury would not believe Bobbitt's statement at the Joswick trial that he testified against Miller in return for a lighter sentence. Judge Wilner states: "Miller, and Judges Battaglia, Bell, and Eldridge, view the one ambiguous response, recorded not as an *answer* but as a *question,* not only as clear proof that Bobbitt, indeed, may have received a benefit for his testimony but as so significant that, had the jury heard that inquisitive response, it likely would not have

convicted Miller of the sexual offense or sentenced him to death." Wilner op. at 27.

These contentions demonstrate either a failure to understand or refusal to concede the actual import of the newly discovered evidence. I do not suggest that the newly discovered evidence established any *proof* that Bobbitt received a benefit for his testimony. Rather, Bobbitt's testimony on redirect in the Joswick case would provide Miller's defense counsel with an important and powerful tool for discrediting Bobbitt's account of the murder. For instance, before the newly discovered evidence of Bobbitt's testimony, Miller possessed no concrete evidence that Bobbitt's motive for testifying was anything other than altruistic. If allowed to hear that Bobbitt had testified in an inconsistent fashion about his motives, however, a *jury* could determine that Bobbitt's testimony was part of a negotiated bargain and, therefore, potentially biased. A *jury* then is less likely to accept Bobbitt's version of the events as true. Even if Bobbitt denies that his testimony in the Miller case came at a cost to the State, Miller's counsel's use of Bobbitt's former testimony as impeachment by prior inconsistent statement provides fodder to encourage Bobbitt's discrediting. Bobbitt's newly discovered testimony is important evidence, whether a *jury* believes its substance or not. As such, a *jury* should have the opportunity to consider it in determining both Miller's guilt and sentence.

This opinion is consistent with the practice of the other courts that have addressed newly discovered evidence of a key witness's cooperation with the prosecution. In *United States v. Harris*, 462 F.2d 1033 (10th Cir.1972), the Tenth Circuit Court of Appeals reversed the trial court's denial of a new trial based on newly discovered evidence that a key prosecution witness had provided his testimony in exchange for the dismissal of various charges against him. *Id.* at 1034–35. The court stated the "general rule" that "a new trial is not necessitated because of newly discovered evidence of a cumulative or impeaching nature unless its potential impact upon the result of the trial is apparent." *Id.* at 1035 (citing *King v. United States*, 402 F.2d 289 (10th Cir.1968); *United States v.*

*Gleeson,* 411 F.2d 1091 (10th Cir.1969)). In holding that a new trial was necessary, the court emphasized how evidence of government cooperation affects the witness's credibility:

> The evidence of [the witness's] plea bargain is cumulative only in that term's broadest sense. It is true that [the witness's credibility] was subject to attack and question because he was an admitted accomplice, a convicted felon, a heroin addict, and was hopeful of some leniency because of his testimony. But it is also true that the incriminating statement of an accomplice whose credibility is accepted is almost hopelessly damaging to the defense. Great leeway should be accorded the defense in establishing such a witness' subjective reasons for testifying. In this case at bar, [the witness's] reason for testifying was premised squarely upon the plea bargain. His "hope for leniency" had in main part been already accomplished through relief from the potential of a multitude of prosecutions. So, too, the government's reliance on the witness is reflected not only in terms of the plea bargain but throughout over 130 pages of trial transcript testimony of [the witness]. The jury should have known of this aspect of the case and fairness requires that the defense be given full opportunity to pursue and argue the matter.

*Id.* (footnote omitted).

In *United States v. Atkinson,* 429 F.Supp. 880 (E.D.N.C. 1977), the court ordered a new trial after the defendant presented newly discovered evidence that a key witness against him lied on the stand regarding the witness's previous convictions and that the witness had testified as part of a bargain with the prosecution. The court described the effect of the newly discovered impeachment evidence:

> Here [the witness] was the only witness who testified to petitioner's participation in the heroin transactions, and the jury's belief in the truthfulness of [the witness's] uncorroborated testimony was essential to a finding of petitioner's guilt. The newly discovered evidence in this case sufficiently impugns the veracity and credibility of the witness ...

that in the interest of justice the jury should have the opportunity of passing upon the credibility of said witness.

\* \* \*

The newly discovered evidence in this case, developed by skilled counsel, "might" have and "probably" would have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.

*Id.* at 887 (citation omitted) (footnotes omitted).

*United States v. Davila,* 428 F.2d 465 (9th Cir.1970) also provides support for my opinion in the present case. Although the court in *Davila* concluded that newly discovered evidence of a witness's induced testimony did not warrant a new trial, it did so because the prosecutor and defense counsel had suggested to the jury during trial that the witness probably had some self interest in testifying. Explaining its reasoning, the court stated:

[C]onsidering the record as a whole, we are of the opinion that the jury would likely have convicted Davila even had the evidence, claimed to have been newly discovered, been introduced at trial. In their summations, both the prosecutor and the defense counsel discussed the possibility that the prosecuting witnesses would receive favorable consideration for having testified against Davila. The prosecutor very forthrightly and fairly stated to the jury, as to one of the witnesses, "And it's fairly obvious that he has some kind of self interest in his testimony," and, as to the other witness, "So, it is fairly obvious again that whatever cooperation he might have given will most probably be called to the attention of the sentencing judge before he imposes sentence. So, you want to keep this in mind." The defense attorney commented: "I am not saying the Government is in some kind of a conspiracy against Davila, all I am saying is that [one of the witnesses] certainly can expect a good deal." In light of these arguments by responsible attorneys, we cannot believe that any jury could be so naive,

collectively, as not to consider whether the witnesses' testimony was influenced by their hope for reward.

*Id.* at 466–67.

In sharp contrast to *Davila*, during the State's closing argument in the present case, the prosecutor urged the jury to believe Bobbitt because, according to the prosecutor, he had nothing to gain by testifying:

> And the defense did their best to somehow impeach Mr. Bobbitt. And don't get me wrong. I wouldn't necessarily suggest you take [him] home, but you got to admit, the guy says this I'm a criminal. I'm a criminal. What you see is what you get. But he tells you what happened. Now the Defense tried to suggest that he was gaining some sort of advantage for this. As a matter of fact, they tried to suggest that he was pending sentencing in another case . . . they tried to suggest that he's hoping something happens. Well here's a guy who's so unconcerned about that that when he pled guilty in Baltimore County back in September of 1999 he didn't tell his lawyer that back earlier in the year he had talked to police about this case. He never even told a lawyer. And they suggest that you can't believe Mr. Bobbitt because he's a liar, he's a criminal, he has something to gain. Whoa, whoa.

Considering what little evidence had been offered to impeach Bobbitt during trial, this argument, at the time, was persuasive; however, it could lose its luster if the jury knew that Bobbitt later testified under oath that his participation in the Miller trial was secured by an agreement with police or prosecutors. The argument would suffer even further damage if the jury understood that, *after* Bobbitt's testimony in the Miller trial, he received an entirely suspended sentence on his guilty plea. Contrary to *Davila*, the Miller jury had no reason to believe that Bobbitt's testimony may have been affected by favorable treatment by the State. Therefore, based on the importance of Bobbitt's testimony and the great potential for it to be undermined by the newly discovered evidence, a new

trial is necessary to allow a jury to decide Miller's fate after hearing all of this newly discovered evidence.

## IV. Conclusion

The evidence that Bobbitt's testimony against Miller may have been induced as part of a plea agreement warrants a new trial in this case. The evidence of the agreement was newly discovered because it came to light long after Miller's trial had concluded. It is more than "cumulative impeachment evidence" and "there is a substantial or significant possibility" that the new evidence would produce a different result. Without Bobbitt's testimony, the evidence may not support a conviction of first degree sexual offense or a finding of the sole aggravating circumstance in this case. Consequently, the trial judge's denial of Miller's motion for a new trial amounted to an abuse of discretion, and it should be reversed.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in this opinion.